In re WISCONSIN CENT. RY. CO.

No. 17104.

District Court, D. Minnesota, Fourth Division.

Oct. 2, 1946.

322

[redacted]

George W. Morgan, of St. Paul, Minn. and M'Cready Sykes, of New York City (Morgan, Chase, Headley & Hoshour, of St. Paul, Minn. and Stewart & Shearer, of New York City, of counsel), for the trustees under the First General Mortgage.

W. Lloyd Kitchel, of New York City (Cadwalader, Wickersham & Taft, of New York City, of counsel), for Protective Committee for First General Mortgage Bonds.

Olin, Clark & Murphy, of New York City, and Stinchfield, Mackall, Crounse & Moore, of Minneapolis, Minn. (Thomas P. Helmey, of Minneapolis, Minn., of counsel), for Empire Trust Company and Henry A. Bultman, trustees of First and Refunding Mortgage.

Henry S. Mitchell, of Minneapolis, Minn. (Leonard H. Murray, of Minneapolis, Minn., of counsel), for Canadian Pacific Railway Company.

Cravath, Swaine & Moore, of New York City, and Frank A. Janes, of Minneapolis, Minn. (Frank H. Detweiler, Frank J. Pohl, and William E. Collins, all of New York City, of counsel), for Chemical Bank & Trust Company and John A. W. Richardson, Jr., as trustees under the Superior and Duluth Division and Terminal First Mortgage.

Mudge, Stern, Williams & Tucker, and Abraham Mitnovetz, all of New York City, and Bergmann Richards, of Minneapolis, Minn. (Paul Duryea Miller and John Wallis, of New York City, of counsel), for Protective Committee for holders of Su-

perior and Duluth Division and Terminal First Mortgage Bonds.

Faegre & Benson and Everett A. Drake, of Minneapolis, Minn., for successor trustee of the Marshfield and South Eastern Division Purchase Money First Mortgage.

James E. Dorsey and Donald West, of Minneapolis, Minn., for trustees of the debtor company.

E. E. Boyner, of Minneapolis, Minn., for Minneapolis, St. Paul & Sault Ste. Marie Railway Company.

NORDBYE, District Judge.

The Wisconsin Central Railway Company, the debtor, is in reorganization under the jurisdiction of this Court pursuant to Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The instant matter is before the Court by virtue of Order 14e, dated December 28, 1945, which propounded the following questions for hearing:

(a). Which of the mortgages of the debtor are a lien upon the equipment of the debtor at the time of such determination, and the extent and priority of such liens, whether by reason of granting clauses, after-acquired clauses, free property clauses, replacement clauses or other clauses in said mortgages, use of impounded funds, or otherwise?

(b). Which of the mortgages of the debtor are a lien upon the materials and supplies of the debtor at the time of such determination, and the extent and priority of such liens, whether by reason of the provisions of the respective mortgages, use of impounded funds, or otherwise?

(c). Which mortgages of the debtor have liens and in what priorities on the properties of the debtor which are subject to the lien of its Marshfield and South Eastern Division Purchase Money First Mortgage, subordinate to the lien of that mortgage?

(d). Which mortgages of the debtor have liens and in what priorities on the rights acquired by the debtor under the Marshfield Coordination Agreement of May 22, 1936, subordinate to the lien of the Marshfield and South Eastern Division

Purchase Money First Mortgage of the debtor?

(e). The principles of law determining the amount of the earnings, if any, of the debtor or the amount of the assets of the debtor or interest therein, if any, which are available as free assets of the debtor for unsecured claims against the debtor.

At a hearing on January 21, 1946, however, all the parties agreed that the determination of question (e) should be postponed indefinitely because this Court's decision of January 18, 1946, upon certain income impounding issues [1] has rendered the existence of any free assets unlikely. The issue may be brought on for hearing at a later date on notice by any interested party.

Each of the other questions will be discussed in order. It is helpful to note at this time that four mortgages exist upon the debtor railway. They are the First General Mortgage (hereinafter called the First General), dated July 13, 1899, the Marshfield and South Eastern Division Purchase Money First Mortgage (hereinafter called the Marshfield Mortgage), effective May 1, 1901, the Superior and Duluth Division and Terminal First Mortgage (hereinafter called the S. & D. Mortgage), executed May 1, 1906, and the First and Refunding Mortgage (hereinafter called the Refunding Mortgage), executed April 1, 1909.

(a). Which of the mortgages of the debtor are a lien upon the equipment of the debtor at the time of such determination, and the extent and priority of such liens, whether by reason of granting clauses, after-acquired clauses, free property clauses, replacement clauses or other clauses in said mortgages, use of impounded funds, or otherwise?

All the parties agree that the First General Mortgage Bondholders possess a prior lien upon presently existing equipment which the debtor owned when the First General Mortgage was executed on July 13, 1899, and also upon equipment which has been purchased with First General Bonds or their proceeds at any time since then. So the maximum equipment in-

---

[1] See In re Wisconsin Central Ry. Co., D.C., 64 F.Supp. 251.

volved under this issue is that which has been purchased since July 13, 1899, with funds other than those obtained from the sale of the First General Bonds.

The First General Bondholders contend that the granting clause, the after-acquired property clause, and the replacement clause of their mortgage give them a prior lien against all of this equipment. The Refunding Bondholders contend, however, that although the Refunding Mortgage was executed after the First General, the Refunding Mortgage's granting clause, after-acquired property clause, and replacement clause entitle the Refunding Bondholders to precedence over the First General Bondholders because the free property clause of the First General negatives the equipment rights claimed under the First General after-acquired property clause. They also argue that the clause relied upon by the First General as a replacement clause does not permit the lien sought. The Refunding Bondholders contend that if the First General Bondholders do possess a lien under their after-acquired property clause, or replacement clause, the Refunding Bondholders' rights nevertheless remain prior to the First General rights upon equipment because the Refundings possessed a purchase money lien or a lien by subrogation against all the equipment paid for between April 1, 1909, the date on which the Refunding Mortgage was executed, and 1932, the date of the receivership.[2] Apparently they rely upon their replacement lien to extend their prior lien to equipment purchased after 1932. The First General Bondholders dispute the Refunding's claim, but declare, in the alternative, that the First General possess a first and prior lien upon equipment which, they contend, was purchased with impounded funds which belonged to the First General Bondholders. Because the impounded funds in question begin to accumulate during the receivership and after First General intervention therein, In re Wisconsin Central Ry. Co., D.C., 64 F.Supp. 251,

only the equipment purchased since that time is claimed to be subject to this First General claim. The S. & D. Bondholders also contend that they are entitled to a first lien upon all equipment purchased since the receivership with impounded funds which belonged to the S. & D. Bondholders. They claim no lien, however, under their mortgage granting clause. The Refundings dispute all claims of priority and lien based upon the use of impounded funds.

The Marshfield Bondholders have entered into a stipulation with the other parties by which the Marshfield claims are recognized.[3] Consequently, they have taken no part in this argument.

All the parties appear to recognize, at least for the purposes of this proceeding, that the granting clause and the after-acquired property clause of the Refunding Mortgage create an effective lien upon all presently existing equipment which was owned when the Refunding Mortgage was executed or which has been acquired since that time. They only dispute, in the manner noted above, its priority and the existence of any other claim which would create a Refunding priority.

In view of these claims and agreements, therefore, the general question stated above resolves itself into several specific questions:

1. Does the free property clause of the First General Mortgage limit the after-acquired property clause with respect to equipment?

2. Do the facts give rise to a purchase money mortgage lien or a lien by subrogation in favor of the Refunding Bondholders?

3. Do the First General Mortgage and the Refunding Mortgage contain replacement clauses? If so, what is their effect?

4. Was any of the equipment now owned or possessed by the debtor purchased with impounded funds which be-

---

[2] No Refunding Bonds appear to have been issued since the receivership began.

[3] Although a limited stipulation was entered into between the Marshfield and the S. & D. Bondholders, the limitation does not seem important for the purposes of this decision in view of the issues before the Court and the conclusions hereinafter reached.

longed to the First General or S. & D. Bondholders?

Each specific question will be discussed in order.

1. Does the free property clause of the First General Mortgage limit the after-acquired property clause with respect to equipment?

Obviously, the problem is to interpret the provisions of the First General Mortgage and to apply the law thereto. The general granting clause of the mortgage grants "All and Singular the following described railroads, situated in the States of Wisconsin, Illinois, Minnesota, and Michigan, and also all the rolling stock, bonds, notes, shares, rights, privileges, franchises and other property now owned by the Railway Company or hereafter acquired by it or its successors, and being a part of or connected with any of said railroads, to wit:—"

Paragraphs 1 to 8 which immediately follow this general provision grant all the railroad lines which comprised the Wisconsin Central in 1899. Paragraph Eleventh and Twelfth, in the light of which the above general provision must be read, provide:

"Eleventh. All the following classes of property now owned or held by the Railway Company, or hereafter acquired by it or its successors, and appertaining to any of said railroads described above in paragraphs first to eighth inclusive:

"All the road bed, rights of way, station grounds, railroad yards, terminal grounds, and all other lands, lands under water, docks, wharves, and riparian rights, all tracks, spurs, branches, side tracks, bridges, viaducts, docks, culverts, fences, depots, station houses, elevators, warehouses, engine houses, car houses, coal houses, wood houses, machine shops, and other shops, and all other buildings or structures.

"All locomotives, tender cars, and other rolling stock and equipment of every kind.

"All tools, implements, machinery, wood, coal, oil, fuel, and other supplies.

"All the privileges, and franchises connected with or relating to any of said railroads, or to the construction, maintenance, use, or operation thereof, whether now held by the Railway Company or hereafter acquired by it or its successors; and all and singular the tenements, hereditaments, and appurtenances to the said premises belonging.

"Also, all the rents, issues, profits, tolls, and other incomes of all the property which shall from time to time be subject to this indenture.

"And also all the estate, right, title, interest, property, claims, possession, and demand whatsoever as well in law as in equity which the Railway Company, or its successors may hereafter acquire in or to or of the same and every part thereof, * * *.

"Also, all stocks, bonds, certificates of indebtedness, claims and other property of every name and nature hereafter acquired by the Railway Company which by any of the provisions of this indenture it is required to pledge, assign or transfer to the Trustees; but except as may herein otherwise be expressly declared, no grant nor pledge of or under this indenture is intended or shall be construed to include any bonds or any shares of capital stock other than those delivered to the Trustees.

"Twelfth. Any and all property of any kind, not herein agreed to be conveyed, transferred and assigned to the Trustees, * * * which from time to time hereafter may be conveyed and mortgaged, or pledged and delivered, or by writing of any kind assigned or transferred by the Railway Company, or by any one on its behalf, to the Trustees. Said Trustees are hereby authorized at any and all times to receive any such property as and for additional security, and also when and as hereinafter provided to receive any property as substituted security for the bonds issued or to be issued hereunder, and to hold and apply any and all such property subject to the terms hereof.

"Provided, however, that at the time of any such conveyance, mortgage, pledge, delivery, assignment, or transfer under this paragraph of property as and for additional security, the Railway Company, by a writing duly executed by it and delivered to the Trustees, may reserve to itself power to sell or to dispose of or otherwise to deal with such property, and from time to

time to use any or all proceeds of such property for any of the purposes for which the proceeds of bonds issued under Section 4 of Article One hereof may be used; but until so used, the proceeds of such property so sold and disposed of shall be pledged hereunder with the Trustees, and

"Provided further, that nothing in this indenture contained shall be construed to limit the right or power of the Railway Company, hereby expressly reserved, to own and hold, or in any manner except by use of bonds secured by this indenture, to acquire by construction, purchase, or lease, other lines of railway, branches, or extensions, or equipment or interest therein, or new or additional terminals, and to hold and to dispose of any property so acquired, and to retain the proceeds thereof free from the lien of this indenture."

The Further Assurance Covenant found in Article Two, Section 3 of the Mortgage, provides:

"Whenever required by the Trustees, the Railway Company will grant, convey, confirm, assign, transfer, and set over unto the Trustees the estate, right, title, and interest of the Railway Company in or to all real and personal estate, corporate rights and franchises which in any way or manner it shall acquire as appurtenant to or for use in connection with the several railroads hereby mortgaged. * * *

"But nothing in this indenture expressed or implied is intended or shall be construed, to limit the right of the Railway Company hereby expressly reserved, to construct, or to acquire and to own and hold, other lines of Railway, or branches or extensions, or interests therein, or terminals, or other property free from the lien hereof."

These are the provisions which govern the question. The second proviso of Paragraph Twelfth is the provision which the Refunding Bondholders contend prevents any property, including equipment, from being within the after-acquired property rights claimed by the First General Bondholders.

It is obvious at the outset that Paragraph Eleventh expressly grants a lien on all the specified classes of after-acquired property which appertained to the specified lines.

So the equipment which appertained to those lines and which was then owned or would be thereafter acquired was within the scope of the Paragraph Eleventh and the First General lien. This grant is in complete harmony with the General Granting Clause which precedes the specific granting clause paragraphs. And, without more, the First General Bondholders would possess a lien upon after-acquired property which appertained to the specified lines.

The Refunding Bondholders contend, however, that the second proviso of Paragraph Twelfth limits the after-acquired property lien to property acquired with the proceeds obtained from the sale of First General bonds. Reference to that provision shows, however, that it does not do so expressly. Any limitations which it imposes must be by implication. If the "proviso" is read alone, and independent of the remainder of the mortgage, this literal interpretation might be inferred from it. But it is well settled, and the parties recognize, that a provision cannot be construed without regard to the rest of the instrument of which it is a part. The intent of the parties must be determined from the entire instrument. Uinta Tunnel, Min. & Transp. Co. v. Ajax Gold Mining Co., 8 Cir., 1905, 141 F. 563, 566; Liberty Nat. Bank & Trust Co. of Savannah v. Bankers Trust Co., 5 Cir., 1945, 150 F.2d 453. And this "proviso", like any other provision, must be interpreted in the light of the other provisions of the instrument and the provision in which it is contained. That such an interpretation fails to sustain the Refunding Bondholders' position is clear. The "proviso" is a part of the free property clause of the granting clause. The first eleven paragraphs of the granting clause state the property upon which a lien is granted by the mortgage. They expressly grant certain lines of railway and property, including equipment, which was then owned or would be thereafter acquired, and which appertained to the specified lines of railway. Paragraph Twelfth, of which the provision in question is a physical part, concerns "Any and all property of any kind not herein agreed to be conveyed, transferred, and assigned to the Trustees, * * *." So the paragraph of which the

"proviso" is a physical part deals with property not appertaining to the lines specified in Paragraph Eleventh. The proviso does not purport to stand alone and independent from the rest of Paragraph Twelfth, in which it is included. On the contrary, it is directly and expressly connected with it by the phrase, "and provided further". Such a phrase is used when draftsmen wish to connect provisions which limit or explain preceding ones. The conjunction "and" is a conjunctive, not a disjunctive, conjunction. "And provided further" are words which join together two related provisions dealing with the same subject matter. So the second proviso is joined together with Paragraph Twelfth by words which show an intent that they relate to the same subject and that the subject dealt with by the entire Paragraph Twelfth is the same and that there is a relation of subject matter between its parts.

■■ The provisions of the "proviso" necessarily contemplate the existence of Paragraph Eleventh and show an intent that the "proviso" be consistent with the grants made by Paragraph Eleventh. For the "proviso" does not say that "all property" thereafter acquired without First General Bond proceeds would be held free of the lien. It specifies the future property which would be held free of the lien. And the term "any property" found in the "proviso" must be interpreted in the light of the properties specified. If the intent was to hold all future-acquired property free of the lien, regardless of whether it appertained to or did not appertain to the lines specified in Paragraph Eleventh, a general provision that all after-acquired property is free from the lien would be sufficient. In specifying the properties in the "proviso", the draftsman necessarily recognized the existence of Paragraph Eleventh, and its scope, for he referred to "other lines, branches, or extensions." This phrase can have meaning only when read in the light of Paragraph Eleventh, for that is the only other paragraph in the granting clause which mentions any "lines, branches, or extensions." Paragraph Eleventh is the only provision which can be used as a basis for determining the "other" lines, branches, and extensions which are covered

by the Paragraph Twelfth's second proviso. Thus, by the word "other", the phrase in the proviso necessarily refers to lines, branches, and extensions not appertaining to the lines mentioned in Paragraph Eleventh and which are the ones not covered by the lien of Paragraph Eleventh. Such a phrase necessarily shows recognition of Paragraph Eleventh and the lien it grants. And in view of this recognition, an intent that Paragraph Twelfth not be inconsistent or in conflict with Paragraph Eleventh seems to be shown, with the intent that the second proviso be in harmony with Paragraph Twelfth of which it is a physical and grammatically connected part. Although the word "equipment" is not preceded by the word "other" in the "proviso", this seems unimportant. For the word "equipment" is omitted from the Further Assurance Covenant, and the words "other property" are added, thus indicating that "equipment" was a part of the general class of property covered by the "proviso". The word "property" in the Further Assurance Clause, by application of the rule of ejusdem generis, must be construed as being property of the same class as that which preceded it, to wit, non-appertaining property. It seems significant that the "proviso", interpreted in the light of the Further Assurance Covenant, as just noted, is as broad as the scope of the property omitted from the Paragraph Eleventh lien—all non-appertaining property. The "or" used in the Further Assurance Covenant between some of the nouns is not used in the usual disjunctive sense, as shown by the lack of its use in the same place in the "proviso" itself and in view of the premises already noted.

■ The "proviso" contemplated the existence of the lien created by Paragraph Eleventh and shows an intent to be consistent therewith in another respect also. This so-called "proviso" is not a true proviso. It limits nothing specifically. This provision, if it limits anything, limits by implication and conflict. In reality it is a reservation. For it reserves a right. A reservation contemplates, by its very nature, that the right reserved has not been given elsewhere. The right, at the time it is reserved, still is owned by the one reserving it. This

is a condition precedent to a valid reservation. So this reservation contemplated that what it reserved was not given away elsewhere in the mortgage. As noted, Paragraph Eleventh granted a lien on the after-acquired property appertaining to specified lines. So the right to a lien on such property had been granted elsewhere in the mortgage. But, on the other hand, the lien rights against non-appertaining property are not granted elsewhere in the mortgage. They are left open by Paragraph Eleventh. And those rights against the non-appertaining property were the only ones not granted by other provisions. These were free to be retained, and their retention by this provision fits harmoniously into the plan of the mortgage as developed by granting paragraph Eleventh and free property paragraph Twelfth, of which the reservation is a part and with which it must be read. To hold that this reservation also reserves rights against after-acquired property appertaining to property covered by Paragraph Eleventh would be contrary to the intended use of a reservation clause, contrary to the rule that one provision must be construed in the light of those in which it is found (here Paragraph Twelfth), contrary to the facts recognized by the very terms of the provision to be interpreted, contrary to the express words of the mortgage (in Paragraph Eleventh), and contrary to the rule that the court should not favor interpretations which cause conflicts with other provisions of the instrument when all the provisions may be interpreted so that they are harmonious and produce a result which is not absurd. Any limiting effect which this "proviso" would have would be by inference. And it requires an unusually clear inference and intent for a reservation to limit, by implication, a right expressly given, as it was here by Paragraph Eleventh, when the reservation, without implied limitation, fits coherently and smoothly into the provision of which it is a physical and grammatically connected part.

If the Refunding position were adopted and the proviso held to relate to appertaining property as well as to non-appertaining property, an unexplained and unexplainable digression would exist in Paragraph Twelfth, which, by grammatical connection, is a single section. But, on the other hand, if the usual relation of paragraphs and their parts is preserved, and the "proviso" held to relate to non-appertaining property just as does the rest of Paragraph Twelfth, this proviso will complete an entirely harmonious section of the granting clause and free property clause and will permit the finding of a harmonious mortgage. For it will then show that there is nothing in the mortgage which is intended to take from the railway the right to hold non-appertaining property free from the mortgage lien if it desires. That is, it will, when construed with the rest of the Paragraph Twelfth, say that nothing in the mortgage will be construed as making the pledging of the non-appertaining property spoken of in Paragraph Twelfth, mandatory upon the railway. And the first proviso of Paragraph Twelfth will deal with the rights which exist with respect to non-appertaining property chosen to be mortgaged as security for the loan upon the appertaining property, and the second proviso will speak of the right to withhold the non-appertaining property from the lien and procedure referred to in the preceding part of the paragraph and proviso. The section will be entirely harmonious within itself and with the rest of the mortgage. Nothing will be left to inference with respect to the railway's rights over non-appertaining property. It will all be expressly provided for. Such a harmonious result strongly indicates that a result causing a conflict between the "proviso" and Paragraph Eleventh and an unexplainable inconsistency between the "proviso" and the rest of Paragraph Twelfth was not intended. Conflicting and inconsistent provisions are not intended by parties to instruments. They intend harmonious and consistent instruments and provisions. The Court must comply with this intent whenever possible. Consequently, in view of these premises, it seems reasonable to conclude that the "proviso" relied upon by the Refunding Bondholders does not limit the after-acquired lien granted by Paragraph Eleventh of the granting clause. For it does not

relate to the same property covered by Paragraph Eleventh. It relates to property which does not appertain to the lines specified by Paragraph Eleventh as subject to the liens granted thereunder. Paragraph Eleventh does not purport to grant a lien on property which does not appertain to the specified lines.

The extrinsic facts fully support this conclusion. For the mortgage was executed at a time (1899) when the railroad was being reorganized financially. This was the only mortgage which was created. And it was to run for fifty years. Approximately two-thirds of the bonds to be issued would be sold to the public for cash, and the proceeds applied to the reorganized railroad. To secure the sales of these bonds, it obviously was necessary to furnish sufficient and attractive security. This being the only mortgage, under all the circumstances, it seems reasonable that an integrated railroad was intended. And it is customary to include after-acquired property clauses in such mortgages. Under all the circumstances, it seems unlikely that the parties intended that, after the original equipment owned in 1899 was worn out, the bondholders would possess none as security. Under the plan, the security during the immediate period following the date of the mortgage was not the most important, for the plan provided for what seemed like a feasible financial arrangement, and the subsequent years, carrying unforeseen circumstances and events, were the ones for which sufficient security would be particularly necessary. But, on the other hand, opportunity for expansion had to be provided for. Consequently, the provision that all property not appertaining to the specified lines was not subject to the lien seems reasonable and necessary. It permits expansion but is not so broad as to prevent protection for those who risked their money so expansion could subsequently occur.

■ The Refunding Bondholders' contention that the Reorganization Agreement must be construed with the mortgage may be sound. But their contention that its provisions indicate that property not purchased with First General Bonds was not subject to the First General Mortgage lien

(if the plan can be so construed) cannot be applied here. If that was the intent of the plan, it was not so stated in the mortgage. The mortgage controls. For that is what actually creates the rights. Expert draftsmen state that which must be presumed to be the intent of the parties at that time. Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., 8 Cir., 36 F.2d 747, at 756. The subsequent acts upon which the Refunding Bondholders rely were not acts to which the trustees of the First General were parties. For various reasons, they do not aid the Refunding position here. Various other contentions made by the Refunding Bondholders have been considered, including their claims that other provisions of the mortgage and related instruments show an intent that the "proviso" in question limits the after-acquired property clause of Paragraph Eleventh. But none of them seem to change the meaning of the mortgage as above noted. All are easily reconcilable. Any other interpretation would do violence to the stated provisions without support from extrinsic material or the provisions of the mortgage. A conflict unsupported by sound reasons cannot be substituted for a consistent interpretation founded upon sound reasoning.

The other contentions of the First General Bondholders which have not been expressly noted above have been considered but found inapplicable in view of the above conclusions or have been found unsustainable. The Rock Island Railroad reorganization case, decided by Judge Wilkerson, and unreported, appears to be in conflict with the result reached with respect to the after-acquired property clause. But each case must turn on its own facts, and the conclusion of that case is not binding on this Court, even though it be contra. The result of that case seems open to question, and, in any event, was only a tentative ruling by that court.

■ In view of these premises, therefore, it is apparent that this first question must be answered in the negative, and that the First General Bondholders possess an after-acquired property lien upon all equipment appertaining to the portion of the railroad covered by their mortgage ac-

quired since the mortgage was executed in 1899. This conclusion renders material the second of the four questions stated above.

2. Do the facts give rise to a purchase money mortgage lien or a lien by subrogation in favor of the Refunding Bondholders?

The following preliminary background seems helpful. The Refunding Mortgage was executed in 1909 as a part of a general Wisconsin Central refunding and refinancing program. The mortgage was intended to pay off all outstanding obligations, including outstanding railroad equipment obligations, First General Bonds, Marshfield Bonds, S. & D. Bonds, and to provide funds with which to acquire new equipment and for other purposes. Under the plan the Refunding Mortgage would be the only mortgage on the railroad. As security the Refunding Bondholders received a lien on all the railway property, including equipment, which appertained to the then existing lines of the Wisconsin Central. The mortgage granting clause provided for a lien upon equipment as follows: " * * * any and all locomotive engines, cars, and other rolling stock, equipment, machinery, instruments, tools, implements, materials, furniture, and other chattels of the Railway Company now owned or hereafter held, acquired or provided by the Railway Company, or its successors, for use upon any of such lines of railroad." But the provisions of the mortgage are not controlling as to this question. As the parties appear to recognize, the lien sought here is one created by rules of equity, rather than the mortgage itself.

The equity rule which the parties recognize is applicable provides that if the equipment was purchased or paid for with First and Refunding Bonds as a part of a single transaction, these bondholders possess a prior lien upon the equipment so acquired. Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., supra, 8 Cir., 36 F.2d at page 761; In re New York S. & W. R. Co., 3 Cir., 1940, 109 F.2d 988, at 990. The parties also agree upon the manner in which the Refunding Bonds were used. They are at issue concerning the application of the single transaction rule to the agreed facts. The agreed facts appear to be as follows:

When the Refunding Mortgage was executed in 1909, the Wisconsin Central still owed $1,941,361.50 for equipment purchased prior thereto at a cost of $3,023,562.61. So $1,082,201.11 had been paid upon the obligations prior to the execution of the Refunding Mortgage. The outstanding equipment debt was evidenced by equipment trust obligations which provided that title should pass to the railway when the obligation had been paid in full. The Refunding Mortgage expressly provided for their retirement. The payments made on these equipment obligations prior to the Refunding Mortgage's execution were made from the general funds of the railway. And they also were made from the general funds after the Refunding Mortgage was executed. In fact, the trustees of the mortgage did not receive a request from the railway to authenticate and deliver any bonds for such payments until 1912, three years after the mortgage had been executed. Pursuant to the resolution of the railway's Board of Directors at about that time, Refunding Bonds were authenticated and delivered to the railway early in 1912 by the trustees in the sum of $980,649 upon the basis of payments made on the equipment obligations from April 1, 1909, to January, 1912. Bonds aggregating $111,946.50 were also delivered upon the basis of payments expected to be made on these obligations during the remainder of 1912. The bonds so delivered were sold and the proceeds paid to the Soo Line, which operated the debtor at that and subsequent times relevant to this proceeding, for the account of the Wisconsin Central, during 1912. The balance of some $848,-000 due on the equipment obligations was paid out of the general funds of the railway from 1912 to 1916, inclusive. In each year following the one in which payment was made on obligations (that is, in 1913, 1914, 1915, 1916, and 1917) Refunding Bonds were delivered to the railway upon the basis of payments made the previous year. But these bonds, together with other bonds hereinafter referred to, were not sold. They were placed in the railway treas-

ury until 1924, when together with the other bonds hereinafter referred to, which brought the total to $8,000,000, they were pledged to secure $6,000,000 of three year notes. Except for a temporary pledge of some bonds to the Soo Line for a loan in 1915, this was the first money realized from Refunding Bonds since 1912. None of the $6,000,000 was used to reimburse the railway treasury for the payments on the equipment obligations. In 1927 the $8,000,000 of bonds noted and an additional $2,000,000 were pledged to secure $7,500,000 face value of a new three year note series. The money obtained thereby was used to pay the $6,000,000 three year notes given in 1924, for additions and betterments to the Wisconsin Central, repayment of advances made by the Soo Line, and for additions and betterments to be made in 1927. The bonds were finally sold in 1930 for $8,000,000 to the Soo Line and used to retire the notes made in 1927, and to pay the interest thereon. The remainder was retained in the treasury to pay interest due on First General Bonds and for necessary corporate purposes.

In addition to the equipment bought on the above mentioned equipment obligation basis prior to 1909, and paid for as noted above, the railway after 1909 bought equipment from time to time. On June 29, 1909, shortly after the mortgage was executed, the Refunding Bonds with a face value of $500,000 were delivered to the railway on the basis of future acquisitions of new equipment. The bonds were sold during 1909 to the general public for cash which was deposited along with other money with the Soo Line to the account of the Wisconsin Central. In 1910 locomotives and passenger cars were purchased from the Soo Line for $244,613.54. The payments for this equipment, although made from the general funds of the Wisconsin Central, were considered as made from the $500,000 proceeds of the Refunding Bonds noted. And in 1911, 1912, and 1913, payments totaling $255,386.66 for three separate contracts for equipment purchased from the Soo Line and for a small amount of additions and betterments to equipment were also considered as having been made from the $500,000 bond proceeds, although in fact made, as before, from the Wisconsin Central general funds on deposit with the Soo Line.

In 1914, 1915, 1916, and 1917, the Wisconsin Central made payments for equipment to the extent of $778,754.92 from its general funds. Each year following the payment (1915 through 1918), Refunding Bonds with a face value of the amount expended were authenticated and delivered to the railway pursuant to the resolution of the railway's Board of Directors. Payments totaling $1,032,100 made to the Soo Line in 1918, 1919, 1920, 1921, 1922, and 1923 for equipment were also made from the railway's general funds. But not until 1924 were any Refunding Bonds authenticated and delivered upon the basis of payments made from 1918 through 1923. None of the bonds authenticated and delivered in 1915 through 1918 and in 1924 upon the basis of equipment payments were sold when delivered. In fact, they remained in the treasury and were included in the $8,000,000 of bonds pledged in 1924 as noted above. They were also included in the $10,000,000 of bonds pledged in 1927 as noted above and the bonds sold in 1930 to the Soo Line.

Upon these facts the issue turns. Whether a single transaction exists depends upon the facts and intent. In re New York S. & W. R. Co., supra; Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., supra. The test is whether the purchase and the payment, or the payment and reimbursement "were part of one continuous transaction and intended so to be." In re New York S. & W. R. Co., supra [109 F.2d 992]. It seems clear, of course, that under this rule the Refunding Bondholders have no prior lien upon the equipment paid for prior to the execution of the Refunding Mortgage. There is an utter lack of any evidence to show that these payments which were made and incurred long prior to the execution of the mortgage and which were not the basis for the issuance of any bonds were a part of the transaction which produced proceeds years later. The First Refunding Mortgage does not provide for funds for reimbursement or anything else

with respect to equipment obligations retired prior to 1909. It provides for the issuance of bonds only to the extent of obligations still unpaid when the mortgage was executed. And no reimbursements appear to have been made on payments made prior to April 1, 1909. The only question here concerns payments made after the execution of the Refunding Mortgage on April 1, 1909.

The Refunding Bondholders rely upon the two cases cited above. But those cases do not state the facts upon which the lien therein was granted. They merely state the rule without showing the facts to which it was applied. Their statements of the rule do show that the reimbursement funds may be placed in general funds and that the payment for which reimbursement is made may be made from general funds. But the circumstances are not shown. So although they state the law which is applicable herein, the results of those cases are not precedent here. Their facts are not shown in sufficient detail. Therefore, the instant problem is an independent one, except in so far as the rules laid down in the cited cases shows the general situation and the result reached.

■ The $500,000 of Refunding Bond proceeds placed in the Wisconsin Central account with the Soo Line in 1909 appears to give the Refunding Bondholders a lien upon the basis of a single transaction. For the proceeds were used directly to purchase equipment. Those bonds had been authenticated, delivered, and issued as bonds intended to be the basis of equipment purchases. Although the equipment payment was not made immediately after receipt of the bonds or their sale, the elapsed time was not so long, in view of the facts, that the transactions cannot be considered a single one. The intent seems clear. The reimbursement and purchase and the payment and purchase need not occur at the same instant. They may be a reasonable time apart, Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., supra; In re New York S. & W. R. Co., supra, if the intent and other facts necessary to a single transaction exist. When the equipment was paid for, the parties recognized that the money used to pay for it was in effect this $500,000 obtained from the bond sales. The bonds were authenticated, delivered, and sold and the proceeds placed in the treasury to meet the equipment purchase payments. The money was, in effect, placed in a separate account. Because it was in fact placed in a general account does not control. Guaranty Trust Co. of New York v. Minneapolis & St L. R. Co., supra. Under all the facts, the transaction seems a single one by intent and act, and the lien sought was acquired upon the equipment at the time the payments were made.

The Refunding Bondholders also appear entitled to a lien to the extent of the $111,-946.50 obtained from the sale of bonds which were authenticated and delivered to the railway in 1912 for equipment obligation payments accruing during the remainder of 1912. For the bonds were authenticated and delivered and the money obtained from their sale was placed in a general fund with the intent that it would cover specific transactions—payment of the equipment obligations. Apparently that obligation was paid to that amount as anticipated. The railway knew that the money for the payment had been placed in the treasury. The mere fact that the money had been placed in the general account and not paid out immediately for the intended purpose is not controlling, at least in the face of other evidence. A reasonable time may elapse. Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., supra. There is no claim or evidence that the money was not paid from the general account. Under all the circumstances, the Refunding Bondholders seem entitled to a lien also to the extent of the $111,946.50 of equipment noted. The situation is closely analogous to the $500,-000 situation noted above.

But no other purchase money, reimbursement, or other lien rights appear to exist in favor of the Refunding Bondholders upon the basis of the facts stated above and the theory advanced. A single transaction must exist. And in order for the payment of a debt and the subsequent sale of bonds which, when sold, produce the amount paid out on the debt, to be a single transaction, the necessary intent for a single transaction

must exist when payment is made as well as when the bonds are sold and the money placed in the treasury. It cannot arise after payment or only when the bonds are delivered or sold. The very nature of such a single transaction contemplates the connection of those things which create it. The need for certainty of the bondholders' rights demands that the intent and facts necessary to a single transaction commence at the beginning of the transaction, and that the transaction is not created ex post facto. For if the lien does not exist when the original payment is made because a single transaction is not contemplated, the mortgage lien of other bondholders, like the First General here, attaches equitably. United States Mortgage & Trust Co. v. Chicago & Alton R. Co., 7 Cir., 1930, 40 F.2d 386.[4] If the beginning part of the transaction need not be connected with the subsequent acts until after the last act is performed, the rights of bondholders like the First General against the equipment paid for would be in a state of flux. The very nature and necessity of the situation requires the continuity of the single transaction from its beginning, when payment is made, to its end, when the bonds are sold and reimbursement occurs. The burden to establish the creation and continued existence of a single transaction is upon the one who seeks the lien—here, the Refunding Bondholders.

In the instant case, payments were made on equipment obligations from April 1, 1909, until January 1, 1912, from general income. No evidence shows that when payments were made any thought of reimbursement from the sale of bonds existed. On the contrary, the lapse of time between the 1909 payments and the 1910 payments on the one hand and the request for and the sale of bonds on the other hand would seem to indicate that the railway planned to make the payments out of income if possible, and to resort to bonds only if they needed money. The circumstances would indicate that when payments were made in those years there was no intent that those payments would start a single transaction which would be culminated by reimbursement from the Refunding Bonds. During all this time the railroad knew that the bonds were available to the extent of the equipment obligations paid or to be paid. For in 1909 the railway obtained the $500,000 of bonds to make some new equipment purchases. So when the railway wanted to use bonds for equipment purchases, it did so, and was aware it could do so, and gave indication that it desired to make the transaction a connected and single one when it wanted it to be such. The railway operated on a yearly fiscal policy. Certainly it would have attempted to consummate all single transactions possible in the fiscal year they were begun or would have given evidence why such was not done. No evidence here shows why the railway did not do so and why it did not even start the consummation by requesting bonds. There is no explanation which sufficiently explains the reason for the delay other than that the payment and the sale and deposit of the bonds in the treasury was not intended to be a single transaction. There is no showing that when the payments on the obligations were made, the reimbursement was needed to an extent that an intent for a single transaction, culminating in reimbursement from the sale of the Refunding Bonds could be inferred. Moreover, there is no showing that the Refunding Bonds were obtained in 1912 with the intent that they be reimbursement for the 1909 and 1910 payments.

The mere fact that the amount of bonds obtained was based upon payments made upon equipment obligations in 1909 and 1910, as well as 1911, does not necessarily show reimbursement intent. The mortgage permitted the issuance of bonds only to the extent of payments made on equipment obligations. That is, the mortgage specified the bases upon which Refunding Bonds

---

[4] Although this case declares itself to be in conflict with Guaranty Trust Co. of New York v. Minneapolis & St. L. Ry. Co., 8 Cir., 1929, 36 F.2d 747, with respect to the rule applied, it is reconcilable upon the basis of the intent existing in each case. The Minneapolis & St. L. case, in any event, does not purport to determine whether a lien would arise in favor of other bondholders if a single transaction were not present there.

could be issued and the extent to which they could be issued upon those specified bases. The reason is obvious in view of the mortgage's purpose—the retirement of all other obligations so the Refunding Mortgage would be protected as the first and only mortgage upon the railway property. The mortgage did not require the money to be used for reimbursement or to be considered such. So far as the pertinent mortgage provisions indicate, the mortgage's only concern was the retirement of the outstanding obligations. So the mere fact that the bonds were authenticated, delivered, and sold upon the basis of, and to the extent of, the 1909 and 1910 payments seems to establish nothing clearly in view of the mortgage's provisions. The mortgage merely permits the issuance of bonds on this basis. It has no reference to reimbursement.

In view of these premises, therefore, the Refunding Bondholders do not appear to have established that an intent for a single transaction existed when payment was made, that such intent continued until 1912, or that the sale of the bonds in 1912 to the extent of the 1909 and 1910 payments was intended to be a reimbursement for those payments. It may have been intended as a mere replenishing of the treasury to the extent permitted by the mortgage. If the mortgage had permitted greater replenishing, the railroad might have requested and sold more bonds.

The 1911 payment on equipment obligations creates a more difficult situation than the 1909 and 1910 payments because of the fact that the application for the authentication and delivery of Refunding Bonds which were to be sold was made within approximately one year after the payment. It conforms more to the fiscal policy of the railroad. But similar premises seem to justify the same conclusion reached with respect 'to 1909 and 1910 payments. There is an insufficient connection established between the authentication, delivery, and sale of the bonds in 1912 and the 1911 payment with respect to their intended and continued singleness; mere payment and authentication, delivery, and sale of bonds upon the basis of the payments do not seem sufficient to establish

a single transaction, especially in view of the Refunding Mortgage provisions. The situation gives rise to inferences other than the continued thought of reimbursement. The burden of proof is upon the Refunding Bondholders.

Furthermore, the Refunding Bondholders' claim to a prior lien upon the basis of payments and bond sales after 1912 cannot be sustained. After 1912, the bonds, not the proceeds, were placed in the treasury. As such, they could not be actual reimbursement for the payments, for they could not be sold for their reasonable price. As counsel for the Refunding Bondholders points out, the interest rate on the bonds prevented their sale. Although the mere placing of the bonds in the treasury might not prevent a purchase money or reimbursement lien in and of itself, the fact that the bonds could not be sold for anything near their reasonable value seems to raise a serious doubt as to whether such bonds can, when put in the treasury, create such a lien. For in fact they make nothing possible. They neither permit purchase in reliance upon their value or reimbursement upon the theory that they have value. As a practical fact, these bonds did not, by any theory, actually reimburse the railroad for the payments made. Possibly they could have been the basis for a loan, but none was made until long after, except a temporary one, the circumstances of which do not appear. A single transaction and resulting purchase money and reimbursement lien seems to contemplate some sort of value. When no real value results therefrom for many years and it is recognized when the bonds are delivered to the railroad that they have no present sale value, the intent that they be the part of a single transaction seems remote. For as a practical matter, they are no value to the proceedings. They cannot be used. In both cases relied upon by the Refunding Bondholders, the court recognizes that the bonds were sold. By the time the Refunding Bonds here produced revenue, such a substantial time had elapsed that any intent that the transaction was a single one seems negatived.

Under all the circumstances, the Refunding Bondholders appear entitled to a prior lien upon the basis of payments of equip-

tnent obligations or purchases with Refunding Bonds only to the extent of the $500,000 and $111,946.50 noted above. Whether their present lien extends to the full value of those payments depends upon the existence of a replacement lien in the Refunding Mortgage.

3. Do the First General Mortgage and the Refunding Mortgage contain replacement clauses? If so, what is their effect?

(a). First General Mortgage:

Article 7, Section 2, of the First General Mortgage provides: "The Railway Company while in possession of the mortgaged premises, shall also have the power, in its discretion, from time to time, to dispose of any portion of the machinery, equipment, and implements at any time held subject to the lien thereof, which may have become obsolete or otherwise unfit for such use, replacing the same by new machinery, equipment, or implements, which shall become subject to this indenture."

The obvious and literal intent of this provision is that, when the equipment subject to the First General Mortgage became obsolete or otherwise unfit for use, it could dispose of that equipment if it replaced it with other equipment and subjected it to the First General lien. The clause, in effect, is a granting clause. The fact that the mortgage contains no covenant to replace and that the instant clause is written in terms of rights and power granted to the railway company does not seem fatal to the replacement lien granted. For the right is granted subject to the performance of a clearly stated correlative duty. If any equipment is disposed of, as provided therein, it must be replaced and subjected to the First General lien. And by signing the mortgage, the railway necessarily agreed to abide by its terms, which required replacement. So by necessary inference, the railway specifically promised to replace equipment of which it so disposed. When the intent of the parties is clear, the form is not controlling. The intent of this mortgage is that the First General Bondholders should possess a lien on all equipment which replaced the equipment to which their lien had attached and of which the railway had disposed by reason of its obsolescence or otherwise being unfit for use.

But this provision does not grant or give rise to a lien equal to the original value of the equipment to which the lien originally attached, as claimed by the First General Bondholders. As Judge Booth pointed out with respect to a similar mortgage provision involved in Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., D.C.Minn., 33 F.2d 512, at 524, such a provision does not require replacements in absence of disposals; it only declares that "if any substitutions or replacements of property were made by the mortgagor, the substituted property should be subject to the lien of the mortgage." Neither the mortgage nor this particular provision requires repairs or maintenance of the original value of the equipment or lien. A true replacement lien clause requires the preservation of that value. Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., 8 Cir., 1929, 36 F.2d 747, at page 757. As far as the mortgage shows, the railway company could retain the original equipment forever, and the First General could do nothing about it. The duty to replace arose under the mortgage only when the equipment subject to the lien is disposed of. It is not a true replacement clause. Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., D.C., 33 F.2d 512, at 524; Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., 8 Cir., 36 F.2d 747, at page 757. The value of the First General lien obtained under this clause, therefore, is equal to the value of the present equipment which replaced the disposed of equipment which was subject to the lien. The noted Minneapolis & St. L. case does not prevent a lien to this extent. As shown by the quotation above, Judge Booth appears to have recognized that such a lien could result. He only decided that "In my opinion, the language falls far short of constituting a covenant to make replacements." He appears to have been speaking of the duty existing before the equipment was disposed of. He did not say that the equipment replacing the disposed of equipment was not subject to any replacement lien. The cases relied upon by the First General Bond-

holders to support their contention that this clause is a true replacement clause are distinguishable from the instant case. Although, as they contend, Judge Booth's statements quoted above may be dictum, they are sound dictum and are in accord with the parties' expressed intention. No extrinsic facts appear to justify a conclusion contrary to the clear and literal intent of this clause. Although, as pointed out, an integrated railroad was intended to be the First General Mortgage security, that intent is not perverted by the noted interpretation. For the First General afteracquired property clause lien still remains to attach to the equipment which supplements the undisposed of equipment. When that fact is recognized, the lack of need for a true replacement clause becomes apparent. The First General Mortgage does not create a true replacement lien.

(b). Refunding Mortgage:

█ Article IV of the Refunding Mortgage provides:

"The Railway Company covenants with the Trustees for the benefit of the Trustees and of the several holders for the time being of refunding bonds:

\*     \*     \*     \*     \*     \*

"(k) That the Railway Company will maintain, preserve and keep all and singular the trust estate, with the fixtures and appurtenances thereto belonging, in thorough working order and repair and will make all needful and proper renewals, replacements and repairs, so that its traffic and business shall at all times be conducted with safety and expedition, and will at all times maintain, preserve and keep its railways and lines, with the apparatus, fixtures and appurtenances in like repair and working order and supplied with all necessary equipment, and will keep all equipment and rolling stock plainly marked with the name of the Railway Company, and will conduct its business and work its railways in an efficient manner, and will diligently preserve all the rights and privileges to it granted and conferred by the laws of Wisconsin or of any other state, \* \* \*."

This covenant plainly requires replacements so that the railway can be operated safely and expeditiously, and it requires repairs which will keep the railway in thorough working order. The duty to repair and replace exists. So the real question, as the parties appear to recognize, is whether a true replacement lien attaches to the replacements and repairs by virtue of the repair and replacement obligations created by the covenant.

The Refunding Bondholders contend that a true replacement lien exists because the railway covenants to preserve, maintain, and keep the "trust estate". They are correct when they say that the Refunding lien applies to replacements. For in order to preserve the "trust estate" to any given extent, the lien must necessarily be preserved to the same extent. But the lien which here applies to the replacements and repairs is not a true replacement lien.

█ As the Circuit Court of Appeals for this Circuit pointed out in Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co., 8 Cir., 1929, 36 F.2d 747, at page 757, a true replacement clause exists when the railway is required "to keep under the lien of this mortgage the same value amount of equipment as it existed at the time of the execution of the mortgage." In the instant case, the railroad is not required to do this. Paragraph (k) limits the duty to make repairs to keeping the trust estate in "thorough working order" and requires replacements only to the extent necessary for the railway's traffic and business to be "conducted with safety and expedition." Obviously, the preservation of the railroad in thorough working order and so that it can be operated with safety and expedition does not require that the value of the equipment which existed when the mortgage was executed be preserved. A railroad and its business and traffic may be conducted with safety and expedition and may be in thorough working order even if the value of its equipment is not the same as when the mortgage was executed. The covenant contained in Paragraph (k) clearly sets up a lesser limit than full preservation of the original value of the equipment existing when the mortgage was executed. The duty to repair and replace is a limited one by the very terms of the provision. It does not contemplate the degree of preservation contemplated by a true replacement

lien. The error of the Refunding Bondholders lies in the fact that they read Paragraph (k) without the words which state the extent to which the repairs and replacements must be made. They read it as requiring absolute preservation of the "trust estate", as it existed when the mortgage lien originally attached, not as requiring preservation of the trust estate only to the extent that it is necessary to keep it in thorough working order and so that its traffic and business can be operated safely and expeditiously. Because the duty to preserve the trust estate depends upon the duty to repair and replace, it seems clear that the duty to preserve the "trust estate" is a limited one and does not require preservation of the value of the equipment which existed when the mortgage was executed.

Analysis shows that the duty to repair and replace, as created by Paragraph (k), is concerned not with preserving the original value of the equipment originally subject to the mortgage, but rather with assuring continued operation of the integrated business. This is apparent from the extent to which repair and replacements are required. For the criterion according to which the railway is required to maintain the equipment concerns the extent of its usability in the business and also its ability to contribute to the going business. The conduct of the going business, not the maintenance of the pre-existing value or right is the criterion which determines the need to repair and replace. The provision requires preservation of nothing to any greater extent than that which assures the equipment will be kept in a condition which will assure the continued operation of the railroad. The very fact that the duty to repair and replace is limited to the extent necessary to keep the railroad going and does not require the preservation of the value of the equipment existing when the mortgage was executed, shows the purpose of the provision is to keep the railroad going, not to create a true replacement clause.

Moreover, the covenant to replace and repair is a part of a paragraph which is concerned with the continued existence of the railroad as a going concern. Each of the other provisions in Paragraph (k) concerns the preservation of various assets necessary to the efficient operation of the railroad and the performance of acts leading to the same end. None of them are concerned with the preservation of the original value of the equipment existing when the mortgage was executed. As the parties recognize, a provision must be interpreted as a whole. And here the purpose of the duty to repair and replace is entirely consonant with the purpose of the rest of the paragraph and the duties which it imposes.

Nothing in the history of the Refunding Mortgage shows any intent for or need of a true replacement lien. On the contrary, the fact that this mortgage would eventually be the only mortgage on the property and contained a broad after-acquired property clause and that no prior purchase money or other first mortgage was contemplated indicates that there was no need for a true replacement clause. The broad security, together with the broad after-acquired property clause, would appear to guard sufficiently a mortgage which was designed to become the first and only mortgage.

In view of these premises, therefore, the Refunding Mortgage Bondholders do not appear to have a true replacement lien. This conclusion does no violence to the requirement that the trust estate must be preserved by repairs and replacements. It only recognizes the limited extent to which the repairs and replacements need be made. It does not destroy the lien which the provision apparently assumes to exist on the replacements and repairs under the after-acquired property clause. It recognizes the existence and the attaching of the lien but disallows its existence as a true replacement lien because such a lien was not intended. Nothing in the mortgage as a whole or in the provision itself declares that the lien was a replacement lien or gives any indication that it was. Mere use of the words "preserve, maintain, and keep" and "trust estate" shows an intent that the existing rights be preserved under the after-acquired property clause just as convincingly as they indicate that a true

replacement clause lien was intended. When, as here, the mortgage was drafted by experts, it may be presumed that, if a true replacement lien was intended, they would make that intent clear, and certainly would not intend a result which is not supported by the plain words and implications of the provision they drafted.

4. Was any of the equipment now owned or possessed by the debtor purchased with impounded funds which belonged to the First General or S. & D. Bondholders?

The First General and the Superior and Duluth mortgagees contend that the equipment purchased by the Receiver and Trustees out of the earnings of the receivership and bankruptcy is subject to the paramount lien of the impounding mortgages in the proportions that such income was earned by their respective mortgage districts. The Court has heretofore held that, by reason of their terms, these mortgages are entitled to the income from their mortgage districts since the time of their intervention, which as a practical matter dates from the inception of the receivership. In an order entered January 26, 1942, the Court reserved as to all prior orders and as to all future orders pertaining to the acquisition of rolling stock and personal property not having a fixed situs in any mortgage district, the question of the respective mortgage lien priorities thereon.

The granting clause of the First General Mortgage states, in part: "Also all the rents, issues, profits, tolls and other incomes of all the property which shall from time to time be subject to this indenture." The Superior and Duluth provisions are the same. Both of the so-called income mortgagees take the position that any income from their mortgage districts which was used to buy equipment during the receivership and trusteeship requires the Court to find that there has been in effect a diversion of the moneys to which they were entitled to apply on their mortgage debt, and where income after the impounding date has been used to purchase new equipment, the lien of the mortgage extends to such property to which the income from their mortgage districts has been transmuted. They characterize such equipment as transmuted income.

At the outset, it seems clear, however, that these mortgagees are not income owners. The impounding does not impress a lien on all income derived from the respective mortgage districts. It attaches only to net income as distinguished from gross income. As stated in Ames v. Union Pacific R. Co., 1896, 73F. 49, 57: "The filing of a proper bill of foreclosure of a mortgage covering the income of a railroad company undoubtedly impounds the revenues of that company for the benefit of its mortgage bondholders, but it does not impound its gross revenue. It impounds only the net revenues that remain after the payment of the operating expenses of the railroad, and such preferential claims as may be allowed under the settled rules of the law."

The court in Illinois Trust & Savings Bank v. Doud, 8 Cir., 1900, 105 F. 123,.148, 52 L.R.A. 481, stated the rule governing railroad income in determining whether current unsecured claimants would take precedence over the mortgage liens as follows: "A mortgagee of the property, acquired and to be acquired, and of the income of a quasi-public corporation, such as a railroad company, obtains a lien upon the net income of the company after the current expenses of operation incurred in the ordinary course of business are paid, and impliedly agrees that the gross income shall be first applied to the payment of these current expenses, before the net income to which he is entitled arises."

Our problem, therefore, is to determine what expenses in the operation of this road during the period in question were properly paid out of gross income derived from the respective mortgage districts before the impounding lien of the mortgages attaches. The question posed may not be entirely free from doubt. It is recognized, of course, that the Receiver and Trustees were fully authorized to pay out of such gross income all administrative and operative expenses. Admittedly, the mortgage lien agreement in both mortgages contemplates the operation of the railroad if there was a default and if it became necessary for the mortgage trustees to take possession. First, there would be the paramount duty to the public, who depended on the transporta-

tion facilities of a quasi-public institution. Secondly, the mortgages would be of but little value if the railroad was not continued as a going concern after default. It is quite probable that a brief receivership would create no particular problem in determining net earnings because the operating expenses of the railroad under such circumstances would usually indicate nothing more than the usual and ordinary every-day expense incurred in its operation. But a longer receivership would require greater expenditures for maintenance, additions and betterments, which a railroad in its normal operations would be required to incur. It is evident that, where there is a protracted receivership, rolling stock would become out of repair and obsolete, and new equipment and materials and supplies in the ordinary and normal operation of the road would be required. It would seem, however, that these very contingencies were recognized by the parties to the mortgages. And in order to ascertain what the parties intended by the net income which would be available for bond interest and principal after default, we look to the language of the mortgage in so far as it may assist in providing the answer to this question. After providing that in case of default the mortgage trustees may enter and operate the railways, it is stated in Article Four, Section 2, of the First General Mortgage, and the S. & D. provisions are substantially the same, that such trustees are empowered to

"make all necessary or proper repairs, renewals, and replacements, and useful alterations, additions, betterments, and improvements thereto and thereon as to them may seem judicious; and, in such case the Trustees shall have the right to manage the mortgaged premises, and to carry on the business and exercise all rights and powers of the Railway Company, either in the name of the Railway Company or otherwise, as the Trustees shall deem best; and they shall be entitled to collect and to receive all tolls, earnings, incomes, rents, issues, and profits of the same and every part thereof; and after deducting the expenses of operating said railway and other premises, and of conducting the business thereof, and of all re-pairs, maintenance, renewals, replacements, alterations, additions, betterments and improvements, and all payments which may be made for taxes, assessments, insurance, and prior or other proper charges upon the said premises and property, or any part thereof, as well as just and reasonable compensation for their own services, and for all attorneys, counsel, agents, clerks, servants, and other employees by them properly engaged and employed, they shall apply the moneys arising as aforesaid as follows:

"In case the principal of the bonds hereby secured shall not have become due, to the payment of the interest in default in the order of the maturity of the instalments of such interest, with interest thereon at the rate of five per cent per annum; such payments to be made ratably to the persons entitled thereto without discrimination or preference;

"In case the principal of the bonds hereby secured shall have become due, by declaration or otherwise, first, to the payment of the accrued interest (with interest on the overdue instalments thereof at the rate of four per cent per annum) in the order of the maturity of the instalments, and then to the payment of the principal of all bonds hereby secured; * * *."

Thus it will be seen that, by the terms of the mortgage, the net income to be applied to the mortgage debt is the surplus left over after the payment of all the usual and customary outlays in the operation of the road. Such customary outlays include all "renewals, replacements, alterations, additions, betterments and improvements." No good reason is suggested why the mortgagees herein should expect greater equities in respect to their liens on income than that which would have existed if their own Trustees were in possession of the properties after default. The receivership was instituted for the benefit of all the creditors and was so expressly recognized by these bondholders and the Trustees of these mortgages. A reading of the mortgages leaves no doubt but that the net income applicable to interest and bond principal contemplates the use of gross income for all necessary additions, replace-

ments, improvements and restorations during the operation of the road after default. It may be pointed out in passing that all of the expenditures made herein for equipment, additions, betterments and maintenance were authorized and incurred after petitions to the Court and with notice to all of the mortgagees. While it is not contended that there has been any waiver of the claimed lien to equipment on the part of these mortgagees, there never has been during the entire receivership any contention on their part that the gross income was not used for the best interest of the estate, or that the expenditures for equipment, etc., were not necessary in the ordinary, usual and normal operation of the road. Moreover, during the entire receivership period, the railroad lines of the Wisconsin Central have been treated and considered as an integral system and money has been expended from gross income derived from the entire operation of the road on numerous types of additions and betterments, such as new ties and rails, automatic signal systems, bridges, turn-tables, spur tracks, station facilities, the remodeling of old equipment, and the purchase of new equipment. Apparently everyone considered that the expenditures were necessary by reason of the problems confronting the Receiver and the Trustees in meeting competition and the demands of traffic. Furthermore, it seems clear that such expenditures played no small part in producing the gross income during the fourteen-year period which enabled the road to build up the cash income now in the hands of the Trustees totaling some several million dollars. At the time of the appointment of the Receiver in 1932, there was a deficit in the operation of the road.

These mortgages were benefited by such expenditures to the extent of the increased earnings of their respective mortgage districts which would be enhanced by the continued operation of the road and its ability to meet competition and to carry on a profitable railroad business, and as to the First General by reason of the lien inuring to it on equipment under its after-acquired clause and replacement clause. No lien of any kind on equipment is granted by the provisions of the Superior and Duluth mortgage. True, according to railroad accounting, the purchase of equipment is usually considered as a capital expenditure, but that fact does not characterize the expenditure as an improper charge against gross income before net income is obtained for the mortgages. Expenditures from gross income on various additions and betterments on the railroad are always charged to capital account, but that does not mean that they should not be termed ordinary operating expenses before net income is available for the income mortgages. And no claim is made here as to "following the res" except as to equipment and material and supplies. As stated by Judge Davis in Re St. Louis Southwestern Ry. Co., D.C. Mo., 1936, 17 F.Supp. 68, 70, when confronted in a railroad reorganization with the problem of using gross income for additions and betterments when the income mortgagee requested that the moneys to be used for such contemplated expenditures belonged to the income mortgagee and should be applied on a defaulted mortgage: "It is elementary law that current expenses arising out of the operation of a business must be paid by the trustee out of available funds. They constitute claims prior to claims of bondholders."

And further (17 F.Supp. at page 71): "There is no reason why expenditures for additions and betterments chargeable to 'capital account' should not have the same preferred status as ordinary operating expenses, when it is shown that the improvements are seriously needed in the proper, efficient, and economical operation of the property and that cash is available. Thus extended, the rule applies to the instant petitions. As a matter of fact, it has been held that the mere fact that the expenditures are in a large part charged to 'capital account' under the Interstate Commerce Commission's rules does not alter the priority of the expenses as 'current debts.' Continental Trust Co. et al. v. W. R. Bonsal & Co. et al., 4 Cir., 72 F.2d 975."

Although the immediate question considered by the court in Strang v. Montgomery & E. R. Co., 1879, 23 Fed.Cas. p. 218, No. 13,523, is not similar to the problem presented here, in that the issue there was between bondholders and the purchaser

at a foreclosure sale, the language of the court is nevertheless strikingly apposite. In that case the court held that the equipment purchased by the receiver became subject to the after-acquired clause of the mortgage and consequently belonged to the purchaser of the mortgaged properties. But the court did specifically hold that the earnings clause of the mortgage applied only to the net revenues remaining after the payment of all the receivership expenses, including the amounts expended for repairs and necessary replacements, and in setting forth its views in that regard the court used the following language:

"What are the creditors entitled to out of the income and profits of the railroad in the hands of a receiver? Clearly, only to the surplus after paying the expenses of conducting the business of the railroad, and preserving the property and keeping it in working condition.

"The receiver has the power, and it is his duty, even without an order of the court, to apply so much of the income of the property as may be necessary to its care and preservation. He could do this in spite of the mortgagees. But in this case, where the order of the court directed him to use the road and carry on its business, and keep it in repair, there can be no question as to his right and duty. All outlays made by him in good faith, in the ordinary course of business of the road, with a view to advance and promote its interest, and to render it profitable and successful, may be allowed in passing his accounts. Such outlay may include, not only the keeping the road and its buildings and rolling stock in repair, but also providing such additional accommodations and stock as the necessities of the business may demand. Cowdrey v. Railroad Co. ([Fed.] Case No. 3,293). If the receiver has the right to do these things, to use the earnings in repairs and replacements of the road and its equipment, how can it be said that the mortgagees are entitled to the gross income? Can they demand that no money shall be expended in repairs? If they cannot, it is because they are not entitled to such part of the income as is necessary to keep the property in repair. They are entitled to the net income. That portion of the receipts which is expended in carrying on the business of the road, and in the preservation of the property, is not income. The income and profits is the surplus after all expenses and repairs and necessary replacements have been made. The mortgagees are entitled to that surplus, and nothing more. These bondholders might as well claim that a bridge rebuilt by the receiver did not pass by the sale, as to claim that engines and cars put upon the road, and necessary to keep up its equipment and do its business, did not pass. Money so expended is no more income and profit than money paid to engineers and brakemen for their services. There is no consideration which would justify the court in holding that the purchasers of the mortgaged property have not acquired title to the rolling stock bought by the receiver. It was as much a part of the mortgaged property as the iron rails put on the track by him."

The income mortgagees strongly rely on In re American Fuel & Power Co., 6 Cir., 1945, 151 F.2d 470. But it would seem that this case is not particularly helpful in the solution of our problem, which is to determine what constitutes a proper charge against gross income in determining the net income of a railroad to which the mortgage liens will attach in a protracted railroad receivership. Moreover, the lien on after-acquired property in the American Fuel & Power Co. case was predicated on the after-acquired clause of the mortgage as well as the fact that the property was acquired during the receivership by use of earnings upon which the mortgagee apparently had a lien. However, it is not entirely clear upon which ground the court rested its conclusion.

The mortgagees suggest that there is an analogy between the problem presented herein and the scope of current expenses as defined by the courts in cases where the question of equitable preference arises when unsecured creditors furnish credit to a railroad within six months of the appointment of a receiver. As between such claimants and an income mortgagee, it is generally held that preference is not awarded to claims for materials or labor "furnished to make necessary, beneficial and permanent additions or improvements to the mortgaged property."

Illinois Trust & Savings Bank v. Doud, 8 Cir., 1900, 105 F. 123, 148, 52 L.R.A. 481; Rodger Ballast Car Co. v. Omaha, K. C. & E. R. Co., 8 Cir., 1907, 154 F. 629. But see Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339. However, it is to be doubted that the so-called analogy is applicable. In the cases referred to, the mortgagee was not a party to the incurring of the debt. It gave no consent thereto or acquiesced therein. It was incurred when the mortgagor was in sole possession and the only reason for any exception to the paramount lien of the mortgagee to the income under such circumstances is the equitable principle that he who seeks equity under the receivership in obtaining the benefit of a receiver to conduct the operation of the property must do equity to materials and supplies men who enabled the road to continue, and which operation redounds to the benefit of the lienholders. The scope of the definition of current expenses under such circumstances is arbitrarily limited so as to restrict the superior claims in equity of unsecured creditors to a relatively small and deserving group. Moreover, the analogy is not persuasive in that the challenged expenditures herein for additions and betterments were incurred in a receivership for the benefit of all creditors, including the bondholders when the mortgagees were parties, and paid from gross income in harmony with that which the mortgage trustees would have done if they had been in possession.

A liberal definition of net profits appealed to the Supreme Court in Union Pacific R. Co. v. United States, 99 U.S. 402, 420, 25 L.Ed. 274, when the court stated: "As a general proposition, net earnings are the excess of gross earnings over the expenditures defrayed in producing them, aside from, and exclusive of, the expenditures of capital laid out in constructing and equipping the works themselves."

In that case the Supreme Court was considering the method of computing net earnings of the Union Pacific Railroad growing out of the subsidy granted to the road by the Government and the railroad's agreement to repay the loan to the Government on the basis of five per cent of the net earnings of the road. The court considered that expenditures out of gross earnings made for bona fide improvements were a proper charge against earnings in determining the net. The court reasoned that "it is better for the ultimate security of the Government in reference to the payment of its loan as well as for the service which it may require in the transportation of its property and mails that $100 should be spent in improving the works than that it should receive $5 towards the payment of a subsidy." While the court in this case was dealing with an entirely different factual situation, it is reasonable to assume that the parties in entering into the present mortgage contracts herein likewise recognized, in the event of receivership for the benefit of creditors, the necessity of plowing back into repairs, additions and betterments, without any income lien attaching, a sufficient part of the gross income as from time to time became necessary before net income was to be available for the income bondholders. This view is entirely consistent with the interpretation which the First General now advances with respect to its after-acquired clause and replacement clause. The income mortgagees not only seek to avail themselves of the benefits inuring to them by reason of the enhancement of their respective mortgage districts resulting from the use of the gross earnings, but to "follow the res" as well. The terms of the mortgages do not sustain their position.

The Court concludes that, under the income mortgages, it was contemplated that the net income to which the lien would attach when the railroad was in operation by the mortgage trustees or by reason of a receiver or trustees in possession for the benefit of all the creditors, including the income bondholders, would be the surplus left over after the payment of all the usual and customary outlays in the operation of the road, which in a lengthy receivership would necessarily include additions and betterments and restorations.

(b). Which of the mortgages of the debtor are a lien upon the materials and supplies of the debtor at the time of such determination, and the extent and priority of such liens, whether by reason of the provisions of the respective mortgages, use of impounded funds, or otherwise?

The problem of the lien on materials and supplies seems determined by the discussion of question (a), supra. Paragraph Eleventh of the First General Mortgage, quoted above, expressly subjects after-acquired supplies and materials to the mortgage lien. The Refunding Bondholders advance the same contention against the effectiveness of this lien as they did with respect to the First General Mortgage lien on after-acquired equipment. For the reasons stated with respect to equipment, the First General Bondholders' lien on after-acquired materials and supplies must be sustained to the same extent as that on equipment.

The claimed lien of the First General and S. & D. Bondholders on materials and supplies which they contend were purchased with impounded income belonging to them cannot be sustained for the reasons given above in refusing to sustain such a lien on the equipment allegedly so purchased. Expenditures for materials and supplies seem even less includable in net income than equipment. Such expenditures are even a more normal requirement and expenditure of a railroad in receivership. Their need on every railroad and the recognition that a railroad continually requires materials and supplies in its normal operation is so clear that further discussion seems unnecessary.

The accretion and accession theory noted by the First General Bondholders but not relied upon by them because they considered it inapplicable, and which was ignored by the Refunding Bondholders, was renounced in Mississippi Valley Trust Co. v. Southern Trust Co., 8 Cir., 1919, 261 F. 765, 767, 768, and therefore cannot be applied here. The case cited seems sound and cannot be distinguished.

The S. & D. Bondholders also claim a lien upon the materials and supplies. That mortgage does provide for a lien upon such property. Consequently, those bondholders also appear to have a lien on after-acquired supplies and materials. However, the extent of the lien and the priority of the First General and S. & D. lien upon the supplies and materials on hand does not seem determinable upon the present record. The parties recognize that evidence concerning the value of the liens must be presented before that question can be determined. That question is not now before the Court. The question of the extent of the lien—that is, the materials and supplies to which it applies—and the value seems so interconnected that the determination of one can best be made at the time the other is determined. Therefore, unless the First General and S. & D. Bondholders settle the problem between themselves, further argument to the Court and evidence concerning the extent of the lien and the value of the lien of each of the claimants—First General and S. & D. Bondholder groups—seem necessary before that problem can be finally settled.

(c). Which mortgages of the debtor have liens and in what priorities on the properties of the debtor which are subject to the lien of its Marshfield and South Eastern Division Purchase Money First Mortgage, subordinate to the lien of that mortgage?

The First General claims a lien upon the Marshfield Division, subject to the Marshfield Purchase Money Mortgage, upon the premise that the Division was a "branch" which appertained to the lines set forth in Paragraphs 1 to 8 of the First General Mortgage granting clause. Paragraph Eleventh grants a lien on all such after-acquired branches. The Refunding Bondholders contend, however, that the property is not subject to the First General lien because it was not acquired with the proceeds from the sale of First General Bonds. Both arguments seem unsound.

The Marshfield Division, prior to 1901, when it became a part of the Wisconsin Central system, by purchase, was another line. It had been built separately and had been financed separately. Its only connection with the Wisconsin Central lines appears to be a physical connection at or near Marshfield and the fact that business was closely interchanged. But almost every railroad is connected physically with another, and interchanges traffic with it. The continuity of travel and shipment without unloading and reloading depends upon such connections. As far as the evidence shows, the Marshfield line had a separate Board of Directors prior to its purchase by the Wisconsin Central. It had equipment of its own, and it was not financially controlled by the Wisconsin Cen-

344

tral. It also did business with other lines than the Wisconsin Central and it was not totally dependent upon the Wisconsin Central for its existence. It appears to have been a separate entity prior to its purchase by the Wisconsin Central. No stock control even appears to be established by the evidence submitted. Such facts seem to require the conclusion that it was another line and should not be designated as a branch of the Wisconsin Central within the purview of Paragraph Eleventh of the mortgage contract. Neither Paragraph Eleventh nor any other paragraph of the First General Mortgage grants a lien on other lines than those specified in Paragraphs 1 to 8 of the granting clause. The second proviso of Paragraph Twelfth declares that "other lines" are not subject to the First General Mortgage lien. Whether those "other lines" do or do not appertain to the First General lines is immaterial, for the First General lien attaches only to the lines specified in Paragraphs 1 to 8 of the mortgage. The use of the words "other lines, branches, or extensions" in the second proviso of Paragraph Twelfth of the First General Mortgage granting clause, which is a free property clause pertaining to property other than that granted by Paragraph Eleventh, shows that, merely because another line is purchased, it does not mean that it becomes a branch of the railroad within the meaning of Paragraph Eleventh and also shows that the question of whether the newly acquired property is a branch within the meaning of the after-acquired clause must be determined as of the time immediately before, not after, its acquisition. Otherwise, every branch would appertain, in a broad sense, and every "other line" which is purchased would become a branch covered by Paragraph Eleventh, and the words in the proviso would become surplusage when specific words show a contrary intent.

■ In view of these premises, therefore, the First General Mortgage does not seem to attach to the Marshfield Division. The Refunding Mortgage contains an after-acquired property clause which is not limited to property appertaining to the lines mentioned in Paragraph Eleventh of the First General Mortgage. Consequently, it seems to attach to the Marshfield property, subject, however, to the Marshfield Purchase Money First Mortgage.

The cases cited by the First General do not define "branch" in any manner which requires a different conclusion. In all of them a distinguishing fact exists. Some of them seem only indirectly applicable, if applicable at all. None of the mortgage provisions involved in the cases cited are sufficiently like the instant one to be persuasive here.

(d). Which mortgages of the debtor have liens and in what priorities on the rights acquired by the debtor under the Marshfield Coordination Agreement of May 22, 1936, subordinate to the lien of the Marshfield and South Eastern Division Purchase Money First Mortgage of the debtor?

■ The parties agree that this question must be determined in accordance with the preceding one. For the rights under the agreement are substitutes for the rights abandoned. This interpretation seems correct. The substituted property still appertained to "other lines" than those to which the First General Mortgage attached. In view of the premises stated above in question (c), and the recognition that the Refunding Mortgage contains an after-acquired property clause, the Refunding Bondholders acquired a lien upon the rights acquired by the railway under the Marshfield Coordination Agreement of May 22, 1936, subject, however, to the lien of the Marshfield and South Eastern Division Purchase Money First Mortgage of the debtor.

Conclusions and Summary

In view of the premises and conclusions reached in the preceding discussion, the following conclusions, in summary form, seem proper with respect to each of the questions numbered as they appear in Order 14e and the above discussion:

(a) 1. The free property clause of the First General Mortgage does not prevent the after-acquired property clause found in Paragraph Eleventh of that mortgage's granting clause from operating with respect to equipment which appertains to the

railway lines covered by the First General Mortgage. Therefore, the First General Mortgage Bondholders possess, under their after-acquired property clause, a first and prior lien, and the Refunding Bondholders possess a second lien under the Refunding Mortgage after-acquired property clause, upon all equipment which appertains to the lines covered by the First General Mortgage; except that equipment upon which, as noted in the second paragraph hereof and in the second section of the first question (a) discussed in the above memorandum, the Refunding Bondholders possess a purchase money lien or a lien by subrogation based upon reimbursement.

2. The Refunding Bondholders possess, upon a purchase money or reimbursement subrogation lien theory, a first and prior lien upon the equipment which was purchased with the $500,000 of bond proceeds deposited in the Wisconsin Central accounts in 1909 and used thereafter for the purchase of equipment. They also possess a like lien under the same theory upon the $111,946.50 of equipment covered by the equipment obligations which were due in 1912 and paid. The First General Bondholders possess a second lien upon that equipment under their after-acquired property clause in so far as it appertains to the lines covered by the First General Mortgage.

3. Neither the First General Bondholders nor the Refunding Bondholders possess a true replacement lien. The amount of their lien cannot be based on the original value of, or the amount invested in, the equipment upon which the lien applied. The present value of the equipment governs.

4. Neither the First General Bondholders nor the Superior and Duluth Division and Terminal Mortgage Bondholders possess any lien upon equipment under the theory that equipment which was purchased since they intervened in the receivership proceedings was purchased with funds which belonged to those bondholders. The funds with which the equipment was purchased since the commencement of the receivership were not a part of the impounded funds to which the First General and S. & D. Bondholders' rights have heretofore been held by this Court to attach.

(b). Both the First General Bondholders and the S. & D. Bondholders possess under their mortgages a lien upon materials which appertain to the lines covered by their mortgages. The extent and value of each lien is not determined at this time. But neither possesses a lien on materials and supplies by reason of their claims against impounded funds.

(c). The Refunding Bondholders possess a lien upon the Marshfield Division properties, subject to the Marshfield Mortgage. The First General Bondholders possess no lien upon the Marshfield Division properties; that property is not within the scope of the security granted by the First General Mortgage.

(d). The Refunding Mortgage Bondholders possess prior rights, subject to those of the Marshfield Bondholders, upon the rights acquired by the Wisconsin Central under the Marshfield Coordination Agreement of May 22, 1936, by virtue of their after-acquired property clause. The First General Bondholders possess no lien upon such rights because the Marshfield properties are not within the scope of the security granted by the First General Mortgage.

Neither the memorandum nor these conclusions purport to determine the value of any lien at this time, nor does this opinion purport to determine which equipment appertains to the respective trust estates. The only issue in each question propounded by Order 14e concerns the existence of a lien.

An exception is reserved to each and every party aggrieved by the foregoing.