EMPIRE TRUST CO. et al. v. UNITED
STATES TRUST CO. OF NEW YORK
and three other cases.

Nos. 13571–13574.

Circuit Court of Appeals, Eighth Circuit.

Jan. 26, 1948.

Thomas P. Helmey, of Minneapolis, Minn., for Empire Trust Co. and Henry A. Bultman, as Trustees under Wisconsin Cent. Ry. Co. First and Refunding Mortgage.

Henry S. Mitchell, of Minneapolis, Minn., for Empire Trust Co. and Henry A. Bultman, as Trustees under Wisconsin Cent. Ry. Co. First and Refunding Mortgage, and Canadian Pac. Ry. Co.

George W. Morgan, of St. Paul, Minn., and Cornelius W. Wickersham, of New York City, for U. S. Trust Co. of New York and Williamson Pell, as Trustees under Wisconsin Cent. Ry. Co. First General Mortgage, and Joseph R. Warner, and others constituting a Protective Committee for the First General Mortgage Bondholders.

Henry S. Mitchell, of Minneapolis, Minn., for Canadian Pac. Ry. Co. and Olin, Murphy & Redmond, of New York City, and Stinchfield, Mackall, Crounse & Moore, of Minneapolis, Minn. (Leonard H. Murray and Thomas P. Helmey, both of Minneapolis, Minn., of counsel), for Empire Trust Co. and Henry A. Bultman, as Trustees under Wisconsin Cent. Ry. Co. First and Refunding Mortgage.

George W. Morgan, of St. Paul, Minn., M'Cready Sykes, of New York City, Morgan, Chase, Headley & Hoshour, of St. Paul, Minn., and Stewart & Shearer, of New York City, for U. S. Trust Co. of New York and Williamson Pell, as Trustees under Wisconsin Cent. Ry. Co. First General Mortgage; and Cornelius W. Wickersham, Edwin Martenet, and Cadwalader, Wickersham & Taft, all of New York City, for Joseph R. Warner, and others, constituting a Protective Committee for the First General Mortgage Bondholders.

Cravath, Swaine & Moore, of New York City, Frank A. Janes, of Minneapolis, Minn., Frank H. Detweiler and Frank J. Pohl, both of New York City, for Chemical Bank & Trust Co., and others, as Trustees under Wisconsin Cent. Ry. Co. Superior and Duluth Division and Terminal First Mortgage.

Mudge, Stern, Williams & Tucker and A. Albert Minton, all of New York City, Bergmann Richards, of Minneapolis, Minn., and Paul Duryea Miller, of New York City, for Howard H. Hubbard, and others, as a Protective Committee for the Holders of Wisconsin Cent. Ry. Co. Superior and Duluth Division and Terminal First Mortgage.

Before SANBORN, WOODROUGH, and COLLET, Circuit Judges.

COLLET, Circuit Judge.

Four appeals were taken from an order of the District Court fixing the priority rights of claimants in Reorganization Proceedings relating to the Wisconsin Central Railway under Section 77 of the Bankruptcy Act. All four appeals were presented on the same record, were argued together, and will be determined by this opinion.

On July 13, 1899, a mortgage designated as the First General Mortgage, securing bonds issued thereunder, was placed on the debtor railway. This mortgage contained certain provisions by which after-acquired property and the income of the railway were subjected to the lien of the mortgage. Subsequent thereto, on May 1, 1906, the Superior and Duluth Division and Terminal First Mortgage, securing another bond issue, was placed on the railway property. The provision of that mortgage material on this appeal relates to a lien on the income of the debtor railway. On April 1, 1909, another bond securing mortgage, referred to as the First and Refunding Mortgage, was executed and placed on the debtor railway's property. That mortgage also contained provisions relating to after-acquired property being subjected to its lien.

The District Court held that the First General Mortgage (hereinafter referred to as the First General) constituted a first lien on substantially all of the debtor's property. With two exceptions, it overruled the claim of the bondholders under the First and Refunding Mortgage (hereinafter referred to as the Refunding Mortgage) that they were entitled to a first lien on much of the debtor's equipment on the theory that the money of those bondholders had been used to purchase or to reimburse in a single transaction the railway company for the purchase of equipment on which there were purchase liens and, hence, that they should have a first lien by subrogation on such equipment. The District Court's Order further denied the Refunding bondholders a replacement lien. Case No. 13,-571 is the appeal of the Refunding bondholders from these rulings.

Claim was made by the First General bondholders to a first lien on operating

equipment purchased during receivership with current earnings of the debtor railway on the theory that, since the First General Mortgage gave them a first lien on earnings, they should have a first lien on operating equipment purchased with those earnings. The trial court treated the expenditures for operating equipment during receivership as operating expenses, deducted them from gross earnings and allowed a lien on the remaining net earnings. From the ruling of the trial court in not treating this operating equipment as a portion of "net earnings" and awarding them a first lien thereon, the First General bondholders appeal. The First General bondholders also appeal from the action of the trial court in overruling their claim for a replacement lien. The First General bondholders' appeal constitutes case No. 13,574.

Claims were filed by the Trustee of the Superior and Duluth Division and Terminal First Mortgage and by the Protective Committee for the holders of bonds secured by that mortgage, asserting a first lien on operating equipment purchased during receivership, upon the same theory advanced by the First General bondholders. These claims were denied by the trial court. The Trustee and the Protective Committee prosecute separate appeals which constitute cases Nos. 13,572 and 13,573, respectively.

### Case No. 13,571

The first contention of the Refunding bondholders is that the trial court erred in its construction of the First General Mortgage in holding that the extent of the lien resulting from the after-acquired property provisions of that mortgage was not limited by the "free property clause". The trial court filed a comprehensive opinion (In re Wisconsin Cent. Ry. Co., D.C., 68 F.Supp. 320, 325) in which the pertinent provisions were exhaustively discussed. Since we find ourselves in agreement with the construction given to these provisions by the trial court and the basis for that construction, no useful purpose would be served by our restating or paraphrasing in this opinion what has been so adequately said by that court on the subject.[1]

---

1 "1. Does the free property clause of the First General Mortgage limit the after-acquired property clause with respect to equipment?

"Obviously, the problem is to interpret the provisions of the First General Mortgage and to apply the law thereto. The general granting clause of the mortgage grants

" 'All and Singular the following described railroads, situated in the States of Wisconsin, Illinois, Minnesota, and Michigan, and also all the rolling stock, bonds, notes, shares, rights, privileges, franchises and other property now owned by the Railway Company or hereafter acquired by it or its successors, and being a part of or connected with any of said railroads, to-wit:—'

"Paragraphs 1 to 8 which immediately follow this general provision grant all the railroad lines which comprised the Wisconsin Central in 1899. Paragraph Eleventh and Twelfth, in the light of which the above general provision must be read, provide:

" 'Eleventh. All the following classes of property now owned or held by the Railway Company, or hereafter acquired by it or its successors, and appertaining to any of said railroads described above in paragraphs first to eighth inclusive:

" 'All the road bed, rights of way, sta-

tion grounds, railroad yards, terminal grounds, and all other lands, lands under water, docks, wharves, and riparian rights, all tracks, spurs, branches, side tracks, bridges, viaducts, docks, culverts, fences, depots, station houses, elevators, warehouses, engine houses, car houses, coal houses, wood houses, machine shops, and other shops, and all other buildings or structures.

" 'All locomotives, tender cars, and other rolling stock and equipment of every kind.

" 'All tools, implements, machinery, wood, coal, oil, fuel, and other supplies.

" 'All the privileges, and franchises connected with or relating to any of said railroads, or to the construction, maintenance, use, or operation thereof, whether now held by the Railway Company or hereafter acquired by it or its successors; and all and singular the tenements, hereditaments, and appurtenances to the said premises belonging.

" 'Also, all the rents, issues, profits, tolls, and other incomes of all the property which shall from time to time be subject to this indenture.

" 'And also all the estate, right, title, interest, property, claims, possession, and demand whatsoever as well in law as in equity which the Railway Company, or its successors may hereafter acquire in

The Refunding bondholders contend that the District Court should ·have awarded them a first lien on the debtor's equipment to the extent of $4,441,000. That claim is based upon the theory that the Refunding bondholders' funds went directly into the retirement of seven equipment purchase contracts, totaling $1,941,000 and that they

or to or of the same and every part thereof, * * *.

" 'Also, all stocks, bonds, certificates of indebtedness, claims and other property of ,every name and nature hereafter acquired by the Railway Company which by any of the provisions of this indenture it is required to pledge, assign or transfer to the Trustees; but except as may herein otherwise be expressly declared, no grant nor pledge of or under this indenture is intended or shall be construed to include any bonds or any shares of capital stock other than those delivered to the Trustees.

" 'Twelfth. Any ,and all property of any kind, not herein agreed to be conveyed, transferred and assigned to the Trustees, * * * which from time to time hereafter may be conveyed and mortgaged, or pledged and delivered, or by writing of any kind assigned or transferred by the Railway Company, or by any one on its behalf, to the Trustees. Said Trustees are hereby authorized at any and all times to receive any such property as and for additional security, and also when and as hereinafter provided to receive any property as substituted security for the bonds issued or to be issued hereunder, and to hold and apply any and all such property subject to the terms hereof.

" 'Provided, however, that at the time of any such conveyance, mortgage, pledge, delivery, assignment, or transfer under this paragraph of property as and for additional security, the Railway Company, by a writing duly executed by it and delivered to the Trustees, may reserve to itself power to sell or to dispose of or otherwise to deal with such property, and from time to time to use any or all proceeds of such property for any of the purposes for which the proceeds of bonds issued under Section 4 of Article One hereof may be used; but until so used, the proceeds of such property so sold and disposed of shall be pledged hereunder with the Trustees, and

" 'Provided further, that nothing in this indenture contained shall be construed to limit the right or power of the Railway Company, hereby expressly reserved, to own and hold, or in any manner except by use of bonds secured by this indenture, to acquire by construction, purchase, or lease other lines of railway, branches, or extensions, or equipment or interest therein, or new or additional terminals, and .to hold and to dispose of any property so acquired, and to retain the proceeds thereof free from the lien of this indenture.'

"The Further Assurance Covenant found in Article Two, Section 3 of the Mortgage provides:

" 'Whenever required by the Trustees, the Railway Company will grant, convey, confirm, assign, transfer, and set over unto the Trustees the estate, right, title, and interest of the Railway Company in or to all real and personal estate, corporate rights and franchises which in any way or manner it shall acquire as appurtenant to or for use in connection with the several railroads hereby mortgaged. * * *.

" 'But nothing in this indenture expressed or implied is intended or shall be construed, to limit the right of the Railway Company hereby expressly reserved, to construct, or to acquire and to own and hold, other lines of Railway, or branches or extensions, or interests therein, or terminals, or other property free from the lien hereof.'

"These are the provisions which govern the question. The second proviso of Paragraph Twelfth is the provision which the Refunding Bondholders contend prevents any property, including equipment, from being within the after-acquired property rights claimed by the First General Bondholders.

"It is obvious at the outset that Paragraph Eleventh expressly grants a lien on all the specified classes of after-acquired property which appertained to the specified lines. So the equipment which appertained to those lines and which was then owned or would be thereafter acquired was within the scope of the Paragraph Eleventh and the First General lien. This grant is in complete harmony with the General Granting Clause which precedes the specific granting clause paragraphs. And, without more, the First General Bondholders would possess a lien upon after-acquired property which appertained to the specified lines.

"The Refunding Bondholders contend, however, that the second proviso of Paragraph Twelfth limits the after-acquired property lien to property acquired with the proceeds obtained from the sale of First General bonds. Reference to that provision shows, however, that it does not do so expressly. Any limitations which it imposes must be by implication.

should be subrogated to the lien of the holders of those equipment purchase contracts. In addition, they claim a first lien on equipment to the extent of $2,500,000. That claim is predicated upon the theory that an equal amount of refunding bonds was drawn down by the debtor to reimburse it for $2,500,000 of disbursements

---

If the 'proviso' is read alone, and independent of the remainder of the mortgage, this literal interpretation might be inferred from it. But it is well settled, and the parties recognize, that a provision cannot be construed without regard to the rest of the instrument of which it is a part. The intent of the parties must be determined from the entire instrument. Uinta Tunnel Min. Transp. Co. v. Ajax Gold Mining Co., 8 Cir., 1905, 141 F. 563, 566; Liberty Nat. Bank & Trust Co. v. Bankers Trust Co., 5 Cir., 1945, 150 F.2d 453. And this 'proviso', like any other provision, must be interpreted in the light of the other provisions of the instrument and the provision in which it is contained. That such an interpretation fails to sustain the Refunding Bondholders' position is clear. The 'proviso' is a part of the free property clause of the granting clause. The first eleven paragraphs of the granting clause state the property upon which a lien is granted by the mortgage. They expressly grant certain lines of railway and property, including equipment, which was then owned or would be thereafter acquired, and which appertained to the specified lines of railway. Paragraph Twelfth, of which the provision in question is a physical part, concerns 'Any and all property of any kind *not* herein agreed to be conveyed, transferred, and assigned to the Trustees, * * *.' So the paragraph of which the 'proviso' is a physical part deals with property *not* appertaining to the lines specified in Paragraph Eleventh. The proviso does not purport to stand alone and independent from the rest of Paragraph Twelfth, in which it is included. On the contrary, it is directly and expressly connected with it by the phrase, 'and provided further'. Such a phrase is used when draftsmen wish to connect provisions which limit or explain preceding ones. The conjunction 'and' is a conjunctive, not a disjunctive, conjunction. 'And provided further' are words which join together two related provisions dealing with the same subject matter. So the second proviso is joined together with Paragraph Twelfth by words which show an intent that they relate to the same subject and that the subject dealt with by the entire Paragraph Twelfth is the same and that there is a relation of subject matter between its parts.

"The provisions of the 'proviso' necessarily contemplate the existence of Paragraph Eleventh and show an intent that the 'proviso' be consistent with the grants made by Paragraph Eleventh. For the 'proviso' does not say that 'all property' thereafter acquired without First General Bond proceeds would be held free of the lien. It specifies the future property which would be held free of the lien. And the term 'any property' found in the 'proviso' must be interpreted in the light of the properties specified. If the intent was to hold all future-acquired property free of the lien, regardless of whether it appertained to or did not appertain to the lines specified in Paragraph Eleventh, a general provision that all after-acquired property is free from the lien would be sufficient. In specifying the properties in the 'proviso', the draftsman necessarily recognized the existence of Paragraph Eleventh, and its scope, for he referred to 'other lines, branches, or extensions.' This phrase can have meaning only when read in the light of Paragraph Eleventh, for that is the only other paragraph in the granting clause which mentions any 'lines, branches, or extensions.' Paragraph Eleventh is the only provision which can be used as a basis for determining the 'other' lines, branches, and extensions which are covered by the Paragraph Twelfth's second proviso. Thus, by the word 'other', the phrase in the proviso necessarily refers to lines, branches, and extensions not appertaining to the lines mentioned in Paragraph Eleventh and which are the ones not covered by the lien of Paragraph Eleventh. Such a phrase necessarily shows recognition of Paragraph Eleventh and the lien it grants. And in view of this recognition, an intent that Paragraph Twelfth not be inconsistent or in conflict with Paragraph Eleventh seems to be shown, with the intent that the second proviso be in harmony with Paragraph Twelfth of which it is a physical and grammatically connected part. Although the word 'equipment' is not preceded by the word 'other' in the 'proviso', this seems unimportant. For the word 'equipment' is omitted from the Further Assurance Covenant, and the words 'other property' are added, thus indicating that 'equipment' was a part of the general class of property covered by the 'proviso'. The word 'property' in the Further Assurance

made from its general revenues for the purchase of equipment under circumstances amounting to a "single transaction" with the result that they should have a purchase money lien superior to the lien of the First General bondholders.

The trial court held that the Refunding bondholders were entitled to a first lien on

Clause, by application of the rule of *ejusdem generis*, must be construed as being property of the same class as that which preceded it, to wit, non-appertaining property. It seems significant that the 'proviso', interpreted in the light of the Further Assurance Covenant, as just noted, is as broad as the scope of the property omitted from the Paragraph Eleventh lien—all non-appertaining property. The 'or' used in the Further Assurance Covenant between some of the nouns is not used in the usual disjunctive sense, as shown by the lack of its use in the same place in the 'proviso' itself and in view of the premises already noted.

"The 'proviso' contemplated the existence of the lien created by Paragraph Eleventh and shows an intent to be consistent therewith in another respect also. This so-called 'proviso' is not a true proviso. It limits nothing specifically. This provision, if it limits anything, limits by implication and conflict. In reality it is a reservation. For it reserves a right. A reservation contemplates, by its very nature, that the right reserved has not been given elsewhere. The right, at the time it is reserved, still is owned by the one reserving it. This is a condition precedent to a valid reservation. So this reservation contemplated that what it reserved was not given away elsewhere in the mortgage. As noted, Paragraph Eleventh granted a lien on the after-acquired property appertaining to specified lines. So the right to a lien on such property had been granted elsewhere in the mortgage. But, on the other hand, the lien rights against non-appertaining property are not granted elsewhere in the mortgage. They are left open by Paragraph Eleventh. And those rights against the non-appertaining property were the only ones not granted by other provisions. These were free to be retained, and their retention by this provision fits harmoniously into the plan of the mortgage as developed by granting paragraph Eleventh and free property paragraph Twelfth, of which the reservation is a part and with which it must be read. To hold that this reservation also reserves rights against after-acquired property appertaining to property covered by Paragraph Eleventh would be contrary to the intended use of a reservation clause, contrary to the rule that one provision must be construed in the light of those in which it is found

(here Paragraph Twelfth), contrary to the facts recognized by the very terms of the provision to be interpreted, contrary to· the express words of the mortgage (in Paragraph Eleventh), and contrary to the rule that the court should not favor interpretations, which cause conflicts with other provisions of the instrument when all the provisions may be interpreted so that they are harmonious and produce a result which is not absurd. Any limiting effect which this 'proviso' would have would be by inference. And it requires an unusually clear inference and intent for a reservation to limit, by implication, a right expressly given, as it was here by Paragraph Eleventh, when the reservation, without implied limitation, fits coherently and smoothly into the provision of which it is a physical and grammatically connected part.

"If the Refunding position were adopted and the proviso held to relate to appertaining property as well as to non-appertaining property, an unexplained and unexplainable digression would exist in Paragraph Twelfth, which, by grammatical connection, is a single section. But, on the other hand, if the usual relation of paragraphs and their parts is preserved, and the 'proviso' held to relate to non-appertaining property just as does the rest of Paragraph Twelfth, this proviso will complete an entirely harmonious section of the granting clause and free property clause and will permit the finding of a harmonious mortgage. For it will then show that there is nothing in the mortgage which is intended to take from the railway the right to hold non-appertaining property free from the mortgage lien if it desires. That is, it will, when construed with the rest of the Paragraph Twelfth, say that nothing in the mortgage will be construed as making the pledging of the non-appertaining property spoken of in Paragraph Twelfth, mandatory upon the railway. And the first proviso of Paragraph Twelfth will deal with ·the rights which exist with respect to non-appertaining property chosen to be mortgaged as security for the loan upon the appertaining property, and the second proviso will speak of the right to withhold the non-appertaining property from the lien and procedure referred to in the preceding part of the paragraph and proviso. The section will be entirely harmonious within itself and with the rest of the mort-

the present value of equipment to the extent of $611,800. This appeal is from the order denying priority on the remainder of the $4,441,000.

It is the well established rule that where, at the instance of the mortgagor, a third person pays the purchase money for additions, and takes title to them

gage. Nothing will be left to inference with respect to the railway's rights over non-appertaining property. It will all be expressly provided for. Such a harmonious result strongly indicates that a result causing a conflict between the 'proviso' and Paragraph Eleventh and an unexplainable inconsistency between the 'proviso' and the rest of Paragraph Twelfth was not intended. Conflicting and inconsistent provisions are not intended by parties to instruments. They intend harmonious and consistent instruments and provisions. The Court must comply with this intent whenever possible. Consequently, in view of these premises, it seems reasonable to conclude that the 'proviso' relied upon by the Refunding Bondholders does not limit the after-acquired lien granted by Paragraph Eleventh of the granting clause. For it does not relate to the same property covered by Paragraph Eleventh. It relates to property which does *not* appertain to the lines specified by Paragraph Eleventh as subject to the liens granted thereunder. Paragraph Eleventh does not purport to grant a lien on property which does not appertain to the specified lines.

"The extrinsic facts fully support this conclusion. For the mortgage was executed at a time (1899) when the railroad was being recognized (reorganized) financially. This was the only mortgage which was created. And it was to run for fifty years. Approximately two-thirds of the bonds to be issued would be sold to the public for cash, and the proceeds applied to the reorganized railroad. To secure the sales of these bonds, it obviously was necessary to furnish sufficient and attractive security. This being the only mortgage, under all the circumstances, it seems reasonable that an integrated railroad was intended. And it is customary to include after-acquired property clauses in such mortgages. Under all the circumstances, it seems unlikely that the parties intended that, after the original equipment owned in 1899 was worn out, the bondholders would possess none as security. Under the plan, the security during the immediate period following the date of the mortgage was not the most important, for the plan provided for what seemed like a feasible financial arrangement, and the subsequent years, carrying unforeseen circumstances and events, were the ones for which sufficient security would be particularly necessary. But, on the other

hand, opportunity for expansion had to be provided for. Consequently, the provision that all property not appertaining to the specified lines was not subject to the lien seems reasonable and necessary. It permits expansion but is not so broad as to prevent protection for those who risked their money so expansion could subsequently occur.

"The Refunding Bondholders' contention that the Reorganization Agreement must be construed with the mortgage may be sound. But their contention that its provisions indicate that property not purchased with First General Bonds was not subject to the First General Mortgage lien (if the plan can be so construed) cannot be applied here. If that was the intent of the plan, it was not so stated in the mortgage. The mortgage controls. For that is what actually creates the rights. Expert draftsmen state that which must be presumed to be the intent of the parties at that time. Guaranty Trust Co. v. Minneapolis & St. L. R. Co., 8 Cir., 36 F.2d 747, at page 756. The subsequent acts upon which the Refunding Bondholders rely were not acts to which the trustees of the First General were parties. For various reasons, they do not aid the Refunding position here. Various other contentions made by the Refunding Bondholders have been considered, including their claims that other provisions of the mortgage and related instruments show an intent that the 'proviso' in question limits the after-acquired property clause of Paragraph Eleventh. But none of them seem to change the meaning of the mortgage as above noted. All are easily reconcilable. Any other interpretation would do violence to the stated provisions without support from extrinsic material or the provisions of the mortgage. A conflict unsupported by sound reasons cannot be substituted for a consistent interpretation founded upon sound reasoning.

"The other contentions of the First General Bondholders which have not been expressly noted above have been considered but found inapplicable in view of the above conclusions or have been found unsustainable. The Rock Island Railroad reorganization case, decided by Judge Wilkerson, and unreported, appears to be in conflict with the result reached with respect to the after-acquired property clause. But each case must turn on its own facts, and the con-

himself, or directs their conveyance directly to the mortgagor, with an express agreement that he shall have a lien for the purchase money, such lien is prior to that of a mortgagee with an after-acquired property clause. Harris v. Youngstown Bridge Co., 6 Cir., 90 F. 322, loc. cit. 329; Guaranty Trust Co. v. Minneapolis & St. L. R. Co., 8 Cir., 36 F.2d 747. It is essential, however, that the circumstances be such that the lien of the third person attach prior to the time when the title of the mortgagor attaches. If the addition comes to the mortgagor free of encumbrance, the lien of the prior mortgage will attach and will not be removed by the subsequent acts of the mortgagor and the third person. Harris v. Youngstown Bridge Co., supra; Farmers' Loan & Trust Co. v. Denver, L. & G. R. Co., 8 Cir., 126 F. 46; United States Mortgage & Trust Co. v. Chicago & Alton R. R. Co., 7 Cir., 40 F.2d 386. It necessarily follows that the intent that the third person shall have a senior lien on additions or replacements shall exist at the time of acquisition by the mortgagor. Furthermore, when, as appears to be true in the case at bar, the equipment purchased with the funds of the third party is equipment which the mortgagor is obligated by the terms of the prior mortgage to acquire for the ordinary and efficient operation of the mortgaged property, it should be made reasonably clear that the funds of the third party would not have been furnished without the assurance of a senior lien on the equipment acquired by the mortgagor before a court of equity will subordinate the lien of the prior mortgage to an equitable lien in favor of the third party. If the financial situation of the mortgagor is such that he can acquire necessary operating equipment free of encumbrance, his obligation to the mortgagee requires him to do so. The factual situation in the present case furnishes an excellent illustration of a practical reason for the last mentioned rule. Of several million dollars worth of operating equipment which was in existence at the time of the execution of the First General Mortgage in 1899, there now remains equipment valued at approximately $28,000. If vendor's liens or purchase money liens existed on all these replacements, the after-acquired property clause in the First General Mortgage would be entirely nullified. Equitable considerations will not permit the unnecessary nullification of an after-acquired property clause in a prior mortgage to the injury of that mortgage holder. The granting of a first lien to a third person on equipment necessary to the operation of the mortgaged estate which his funds purchased is equitable to the prior mortgagee only when there is no affirmative obligation on the part of the mortgagor to acquire the addition or equipment or, an obligation to acquire existing, it could not have been acquired without a first lien in favor of the vendor or he who furnished the funds for its acquisition. Harris v. Youngstown Bridge Co., supra, 6 Cir., 90 F. 322, loc. cit. 329.

Substantially the same principles apply to a determination of priority rights between a mortgagee and one who furnishes funds to discharge a vendor's lien. If the circumstances are such as to show an intent on both the part of the third party who furnishes the funds and the mortgagor, at the time the funds are furnished, that the former shall be subrogated to the rights of the vendor and the circumstances surrounding the retirement of the vendor's lien are such that it is clear that the furnishing of the funds was for the very purpose of retiring the vendor's lien, then it is appropriate that the third party be treated as an assignee of the holder of the vendor's lien. The District Court placed emphasis upon the single transaction rule as a criterion for determining whether an equitable lien should exist in favor of the Refunding bondholders. The so-called single transaction rule is an embodiment of the principles above stated. It is as necessary to

clusion of that case is not binding on this Court, even though it be contra. The result of that case seems open to question, and, in any event, was only a tentative ruling by that court.

"In view of these premises, therefore, it is apparent that this first question must be answered in the negative, and that the First General Bondholders possess an after-acquired property lien upon all equipment appertaining to the portion of the railroad covered by their mortgage acquired since the mortgage was executed in 1899. * * * *"

preserve the benefits of the application of that rule in proper cases as it is to avoid its improper application. The existence of the rule furnishes such great opportunity for the creation of devices of a fraudulent nature designed to defeat the after-acquired clause of a prior mortgage that caution should be exercised in applying it.

The facts which the Refunding bondholders contend justify the application of the foregoing principles are as follows.

First, with reference to the retirement of equipment trust obligations. The Refunding Mortgage was executed in 1909 as a part of a general refunding and refinancing of the Wisconsin Central's obligations. The bonds secured by that mortgage were to be used to pay off all outstanding obligations, including outstanding railroad equipment obligations, First General Bonds, Marshfield Bonds and Superior and Duluth Division and Terminal First Mortgage, and to provide funds with which to acquire new equipment. The plan of refinancing contemplated that the Refunding Mortgage would be the only mortgage on the debtor's property. As security, the Refunding bondholders received a lien on all the railroad property, including equipment, which appertained to the then existing lines of the Wisconsin Central. The Refunding Mortgage contained the following provision relative to the issuance of bonds upon the payment of equipment trust obligations:

"2. The aggregate principal sums secured by all the refundings bonds at any time or times issued under and secured or intended to be secured by this indenture shall not exceed $60,000,000, and each of the bonds shall be executed by the Railway Company, from time to time, in the form of coupon bonds, and shall be delivered to the Trust Company to be authenticated and delivered by it, without regard to numbers, in the following manner and for the following purposes:

"(a) $36,459,000 par value of the refunding coupon bonds shall be authenticated and delivered by the Trust Company from time to time when and as the President or a Vice-President of the Railway Company shall direct in writing, in exchange for or after the payment or cancellation of any of the bonds or obligations hereinafter described (hereinafter collectively referred to as the underlying bonds), and upon the following terms, to-wit:"

\* \* \* \* \* \*

"$34,941,000 par value of the refunding bonds shall be authenticated and delivered as aforesaid for an equal amount at par of the following:"

\* \* \* \* \* \*

"Equipment Bonds of the Wisconsin Central Railway Company, secured by deed of trust or agreement between said Railway Company and the Dickinson Trust Company, dated April 1st, 1908........ 98,000

"Obligations of the Wisconsin Central Railway Company, issued under certain equipment contracts with the Haskell & Barker Car Co., dated respectively, April 13th, 1905, November 14th, 1906, and September 16th, 1908, and with the Pullman Co., dated June 14th, 1905, now in force ..................... 1,608,000

"Gold Equipment Bonds of the Wisconsin Central Railway Company, secured by deeds of trust or agreements between the said Railway Company and the Metropolitan Trust Company, dated July 1st, 1902 .................. 235,000"

Each of the seven equipment purchase contracts provided for the payment of the purchase price of the equipment in installments and each provided that the title to the equipment should remain in the vendor until the purchase price was fully paid. On April 1, 1909, when the Refunding Mortgage was executed, the balance due on all seven contracts was $1,941,361.50. Prior to the execution of the Refunding Mortgage the installments were paid out of the general funds in the Wisconsin Central Treasury. Subsequent to April 1, 1909, they were paid in the same manner.

The Wisconsin Central Board of Directors on January 29, 1912, directed that certification of the payment of equipment trust

obligations or contracts be made to the Trustee of the Refunding Mortgage for the purpose of securing the Trustee's authentication and issuance to Wisconsin Central of an equivalent amount of Refunding Bonds. The minutes of the January 29th meeting as amended by resolution on March 9, 1912, contain the following recitation:

"Whereas this Company is authorized under the provisions of said (Refunding) mortgage to issue additional bonds for the following purposes, to wit:"

\*   \*   \*   \*   \*   \*

"Resolved, That the President and Secretary of this Company be and they are hereby authorized to execute and deliver for certification \* \* \* bonds for the purposes aforesaid, \* \* \*"

"Resolved, That said Empire Trust Company be and it is hereby authorized and requested to authenticate said \* \* \* First and Refunding Mortgage Four Per Cent Gold Bonds due 1959 of this Company and deliver the same to Mr. E. Pennington, or as he shall direct \* \* \*"

The minutes contained a tabulation of the various purposes referred to in the quoted paragraphs, including a statement of payments made on equipment purchase contracts. Bonds in the sum of $980,649 were authenticated and delivered to the Railway Company pursuant to the foregoing action of the Railway Company's Board of Directors. These bonds were sold and the proceeds paid to the Soo Line for the account of the Wisconsin Central. The Soo Line was then operating the debtor railway.

The minutes of the same meeting further stated: "Whereas the following payments are required for the current year under equipment obligations, to-wit:"

This recitation is followed by a tabulation of obligations totaling $338,090.20, of which $111,946.50 was actually paid thereafter, and the following resolution: "Resolved, That the President of this Company is hereby authorized and directed to make the improvements, additions and betterments hereinbefore specified during the year 1912 and to cause the payments due in said year on said equipment obligations to be made when and as they shall fall due; \* \* \*"

The balance due on equipment obligations was paid out of the general revenue funds from 1912 to 1916 inclusive. In each of the years, 1913, 1914, 1915, 1916, and 1917, the Wisconsin Central Board of Directors called upon the Refunding Mortgage Trustee for the authentication and delivery of Refunding bonds in amounts equal to the amount of equipment obligations paid during the preceding year. The language used in the minutes and the resolutions of the Board is substantially the same for each of those years. The following language of the 1913 minutes and resolution is typical of all:

"Whereas, this Company has authority under its First and Refunding Mortgage, dated April 1, 1909 to issue its First and Refunding Bonds for the purpose of refunding certain prior bonds and equipment obligations described in said mortgage, and among others, its \* \* \* equipment obligations as follows:" (Here follows a general description of the $1,941,361.50 of equipment obligations outstanding on April 1, 1909.)

"Whereas, \* \* \* this Company has paid equipment obligations maturing since April 1, 1909 and not included in any previous requisition for refunding bonds to the amount of $139,041.50 as follows:" (Describing the payments.)

"Now Therefore, Further Resolved, That the President or Vice-President of this Company shall deliver or cause to be delivered to \* \* \* one of the Trustees under said First and Refunding Mortgage, \* \* \* (the) paid notes or bonds or other proofs of payment covering said equipment obligations maturing and paid during the year 1912 with a written direction to said Trust Company to authenticate and deliver therefor an equal amount par value of said refunding bonds."

These bonds issued in 1913 through 1917 were not sold. They were placed in the Railway Company's Treasury until 1924 when they, with other bonds altogether totaling $8,000,000, were pledged to secure $6,000,000 of three-year notes. The report of the Interstate Commerce Commission on the debtor's application to it to pledge these bonds, states that the proceeds

of the $6,000,000 notes were to be used by debtor for "Reconstruction of ore docks, $1,420,000; Repayment of advances made by the Soo Company, $3,000,000; Additions and betterments to the Central Company's property, $1,580,000." In 1927 the $6,000,000 notes matured. It was refinanced by adding $2,000,000 of refunding bonds to the $8,000,000 previously pledged, and using the $10,000,000 to secure promissory notes totaling $7,500,000. The proceeds of these notes were used to retire the $6,000,000 notes; for additions and betterments to debtor's property, $557,000; to repay advances of the Soo Line, $718,000; and for additions to debtor's property in 1927, $225,000. When the $7,500,000 notes matured in 1930, it was paid off by selling the $10,000,000 Refunding bonds for $8,000,000. The balance of the $8,000,000 remaining after the payment of the $7,500,000 notes was used to pay interest and necessary corporate purposes. There does not appear to be any requirement in the Refunding Mortgage that equipment purchase contracts be assigned to the Trustee for the benefit of the Refunding bondholders. Nor does there appear to be any provision in the mortgage that the bondholders shall have any special purchase money lien on equipment securing the equipment purchase contracts.

The facts surrounding the retirement of the equipment obligations do not evidence a clear intention of the parties to the Refunding Mortgage that the bondholders secured by that mortgage should have a first lien on equipment covered by these equipment obligations. The mortgage simply authorized the authentication and delivery of additional bonds to the Railway Company as these equipment obligations were paid off. Nor do the minutes of the Board of Directors, calling for the authentication and delivery of Refunding bonds as the equipment obligations were discharged, anywhere state that it was the intention of any one that the Refunding bondholders should be subrogated to the rights of the holders of the equipment obligations. On the contrary, as the District Court found, the facts indicate that, with the possible exception of the $111,800 not now in dispute, the sole

intent of the transactions was that the Railway Company should take down these bonds to use as it pleased. It had the right to do so under the Refunding Mortgage. And that is what it did.

The material provisions of the Refunding Mortgage, relative to the issuance of Refunding bonds to the Railway Company upon the purchase of equipment, are:

"(c) The remainder of the refunding bonds amounting at par to $21,691,000 shall, except as provided in paragraph (d) of Article IV hereof, be authenticated, and delivered by the Trust Company from time to time when and as directed by resolution of the Board of Directors of the Railway Company, not exceeding, however, at par the actual cost to the Railway Company of any or all of the following described additions, improvements and property hereafter made or acquired by the Railway Company by purchase, construction or otherwise, and subject to the limitations hereinafter set forth, to-wit:

"$2,500,000 par value of the refunding bonds may be issued for the acquisition of rolling stock and equipment."

\*    \*    \*    \*    \*    \*

"\* \* \* Before authenticating any refunding bonds as aforesaid the Trust Company shall be entitled to receive a certified copy of a resolution or vote duly adopted by the Board of Directors of the Railway Company authorizing the making or acquisition as aforesaid of permanent betterments or improvements or additional property of one or more of the classes above mentioned and setting forth the actual cost thereof to the Railway Company, and that the same has been made or. acquired by the Railway Company and has been or is about to be subjected to the lien of these presents and has not been made the basis of any previous issue of refunding bonds, and also requesting the authentication of refunding bonds accordingly, and the delivery thereof in accordance with such resolution. \* \* \* The said resolution or vote shall be accompanied by a certificate signed by the President or General Manager and by the Chief Engineer of the Railway Company setting forth the actual cost of the betterments,

improvements or property stated in said resolution or vote, * * * The said resolution or vote and the said certificate may be received by the Trust Company as sufficient in order to authorize the authentication and delivery of the bonds reserved under the provisions of this subdivision to the amount named in any such certificate, and it shall not be liable in any way for authenticating and delivering said bonds upon the faith of the truth of the statements therein set forth."

Of the $2,500,000 authorized for the purchase of equipment, $500,000 of Refunding bonds were issued under the following circumstances. On June 29, 1909, the Railway Company's Board of Directors adopted a resolution stating that:

"Whereas, under the authority of the First and Refunding Mortgage * * * it is provided among other things that $1,850,000 of the par value of said bonds should be issued as requested by a resolution of the Board of Directors of this Company to reimburse its treasury for advances made on account of the construction of the Duluth extension and the acquisition and improvements of terminals appertaining thereto, and for the completion of said extension and terminals, and that $2,500,000 par value of said bonds may be issued for the acquisition of rolling stock and equipment, * * *"

"Whereas, it is necessary to issue $500,000 par value of said bonds for the purchase of new rolling stock and equipment, and $150,000 par value of said bonds for permanent betterments and improvements, and * * *"

"Resolved that the * * * Trustees of the First and Refunding Mortgage be requested to authenticate and deliver * * * $2,500,000 par value of the bonds authorized by said mortgage, to be disposed of at the best price available, and that the proceeds thereof shall be applied to the purposes aforesaid."

The $500,000 of bonds mentioned in the foregoing resolution were delivered and sold and the proceeds used for the acquisition of equipment. The trial court held the Refunding bondholders were entitled to a purchase money lien on equipment to the

extent of this $500,000. This preference constitutes a portion of the $611,800 preference heretofore referred to. There is no appeal from that portion of the trial court's order.

During the years 1914, 1915, 1916 and 1917, equipment was purchased to the extent of $778,754.92. Payment was made therefor from the general funds of the Railway Company. Each year during that period resolutions of the debtor's Board of Directors were presented to the Refunding Mortgage Trustee, requesting authentication and delivery of an amount of Refunding bonds equal to the amount of equipment purchased that year. The following language of the resolution of February 19, 1914, provides a fair example of the phraseology of all those resolutions:

"Whereas this Company has authority under its First and Refunding Mortgage dated April 1st, 1909, to issue the First and Refunding Bonds for the following among other purposes, to-wit:

*     *     *     *     *     *

"2. For the acquisition of rolling stock and equipment............ $2,500,000.00"

*     *     *     *     *     *

"Whereas, * * * and there has been expended for the acquisition of rolling stock and equipment, not heretofore funded ........................ $189,092.08"

*     *     *     *     *     *

"Whereas, it is deemed for the best interest of this Company to issue its refunding bonds for the purpose of refunding all of said underlying bonds and equipment obligations so acquired or paid and said expenditures for permanent betterments and improvements and additional depots, terminals and terminal facilities and for the improvements of those owned by the Railway Company not heretofore made the basis for the issue of said refunding bonds, Now Therefore,

"Resolved, that said expenditures for permanent betterments and improvements, additional depots, terminals and terminal facilities and improvements to the same as shown in detail by statements submitted to the Directors at this meeting be and the same are hereby in all things ratified, approved and authorized; that the actual

cost to the Railway Company was the amount aforesaid; that the same have been made, constructed or acquired by the Railway Company and have been subjected to the lien of said First and Refunding Mortgage and have not been made the basis of any previous issue of refunding bonds, * * *"

* * * * * *

"Resolved, that the President and Secretary of this Company be and they are hereby authorized to execute $783,000.00 par value of the First and Refunding Mortgage 4% Gold Bonds of this Company due 1959 for the purposes aforesaid and deliver the same to the Empire Trust Company, Trustee under said mortgage, and that said Empire Trust Company be and they are hereby requested to authenticate and deliver the same to Mr. E. Pennington, the President of this Company, or as he shall direct in writing, and Further

"Resolved, that the Secretary of this Company transmit to said Empire Trust Company a duly certified copy of the foregoing resolutions, together with a certificate or certificates signed by the President or General Manager and Chief Engineer of the Company, setting forth the actual cost of the additions and betterments and additional depots, terminals or terminal facilities and. improvements to the same, stated in said resolutions, all as required by said Mortgage."

These bonds were not sold but were retained in the Railway Company's Treasury until they with others were pledged to secure the $6,000,000 notes in 1924 as heretofore noted.

Payments for equipment purchased during 1918, 1919, 1920, 1921, 1922 and 1923 were also made from general funds. Annual requests for the delivery of bonds in an amount equal to the amount of these expenditures were not made. But in 1924 the debtor's Board of Directors requested the authentication and delivery of $1,032,153 of bonds constituting the unissued remainder of the $2,500,000 authorized by the Mortgage. This resolution recited that the Company had authority under the Refunding Mortgage to issue $2,500,000 of Re-

funding bonds inter alia for the acquisition of rolling stock and equipment, that $1,467,847 of that total had been issued, "leaving $1,032,153 of bonds for the acquisition of rolling stock and equipment still available for refunding", that the Company had paid "equipment obligations" maturing since January 1, 1918, less credits, totaling $1,223,679.02, that it was "for the best interests of the Company to issue its refunding bonds for the purpose of refunding * * * said 'equipment obligations' acquired or paid * * * amounting to $1,032,153." The bonds were authenticated and delivered, were placed in the Treasury of the Company and like those delivered on account of the purchases made from 1914 to 1917 inclusive were, with others, pledged in 1924 to secure the $6,000,000 notes.

There is nowhere in the record any evidence indicating a clear intention on the part of any party to these transactions that the Refunding bondholders should have a special purchase money lien on the equipment purchased from time to time by the debtor. The stronger implication from all the facts is that the Refunding bondholders had notice by the terms of their mortgage that these bonds would be issued by the Trustee as a matter of course when the Railway Company certified, among other things, the retirement of First General bonds, the retirement of equipment obligations, and the acquisition of equipment (to the extent of $2,500,000). They understood from the terms of the mortgage that the Refunding bonds were being issued among other purposes to take up senior liens and that until that was done the lien of their mortgage must of necessity be second to those. It was important to the Refunding bondholders that equipment purchased by the debtor after the execution of their mortgage should come under that mortgage in order that their lien be first when the prior liens were extinguished. That was accomplished by the after-acquired property clause in their mortgage. But there is no basis in this record for the conclusion that it was understood or intended that the Refunding bondholders should have a purchase money lien superior to prior existing liens.

The case of Guaranty Trust Co. v. Minneapolis & St. L. R. Co., 8 Cir., 36 F.2d 747, is cited as supporting a contrary conclusion. Such facts as are set forth in that opinion indicate that the issuance of those bonds was so connected with the retirement of equipment trust obligations as to justify the conclusion that the issuance of the bonds and the retirement of the equipment trust obligations were "single transactions" within the meaning of that rule, with the intention that the bondholders who furnished the funds were to succeed to the rights of the equipment trust obligees. The facts in the case at bar, as heretofore stated, do not justify that conclusion.

The Refunding bondholders further contend that the District Court erred in its construction of the replacement provisions of the Refunding Mortgage. Their contention is that their mortgage required the Railway Company to replace obsolete or worn out equipment with equipment of an equal value which should be subjected to the lien of the Refunding Mortgage; that the Refunding bondholders had a first lien on equipment purchased with the proceeds of their bonds to the extent of $4,441,000; that since most of that equipment has been replaced with the equipment now owned by the debtor, they should have a first lien on the presently owned equipment of the debtor to the extent of $4,441,000.

■ The conclusions reached heretofore, that the Refunding bondholders were not entitled to be subrogated to the rights of vendors of equipment, holding equipment purchase contracts or obligations other than allowed by the District Court, and that the Refunding bondholders were not entitled to purchase money liens on equipment purchased subsequent to the execution of their mortgage, other than allowed by the District Court, in effect disposes of this contention. They had a second lien under the after-acquired property clause of their mortgage on all of this equipment on which the District Court did not give them a first lien and on which the First General bondholders did not have a first lien. By the order of the District Court they are awarded those rights. We are in accord with the conclusion reached by the trial court that the Refunding Mort-

gage did not provide for a true replacement lien.

### Cases Nos. 13,572 and 13,573.

These cases are separate appeals of the Trustee of the Superior and Duluth Division and Terminal First Mortgage of the Wisconsin Central Railway Company and of the bondholders' Protective Committee for holders of Superior and Duluth Division and Terminal First Mortgage Bonds, from the order and judgment of the District Court denying them a lien on equipment purchased during receivership with operating revenues.

■ The appellants in cases Nos. 13,572 and 13,573 have adopted the brief of the appellant, First General Bondholders, in case No. 13,574 on this point. The situation of both is exactly the same on this issue. The trial court in its Memorandum Opinion considered this issue as to both appellants together. See D.C., 68 F.Supp. 320, 338-342. It ruled in effect that equipment necessarily purchased out of operating revenue during receivership was not subject to the liens of these mortgages, although the revenue itself would have been subject to the liens if it had not been used to keep the road in operation. We realize, as did the trial court, that the question of what items of expense may be deducted from gross revenue in determining the net revenue which is subject to the lien of a railroad mortgage covering income, is not free from doubt, but we think that the trial court, under the circumstances disclosed by the record, reached a permissible conclusion.

### Case No. 13,574.

This appeal is by the Trustee under the First General Mortgage and the Protective Committee for the First General Mortgage bondholders who state in their brief: "The First General Trustees and Protective Committee are filing their 'Appellants' Brief' at this time only because Rule 14 of this Court requires every party who appeals from any portion of an Order to file a first brief as Appellant. On the appeals as a whole the First Generals are not primarily appellants but have appealed, on the points referred to, only to protect their interests because of appeals by other parties. They

are in complete accord with the *result* reached by the District Court and would therefore be entirely satisfied with the practical effect of an affirmance in its entirety of the District Court's Order on equipment."

In view of this expressed attitude of the First General bondholders and the conclusions heretofore reached on the issues presented by the Refunding bondholders, it is unnecessary to consider further the matters presented on the appeal of the First General bondholders.

The Order and Judgment of the trial court is affirmed.